The **FIRST NATIONAL BANK OF PENNSYLVANIA, Plaintiff,**

v.

**SEDGWICK JAMES OF MINNESOTA, INC., formerly known as and/or successor in interest to Fred S. James & Company of Minnesota, Inc.; Sedgwick James, Ltd., formerly known as and/or successor in interest to Fred S. James & Co., Inc.; Joseph W. Steman; Milton Mende; J.G. "Jackson" Stacey; and Daniel M. Militzer, Defendants.**

**Civ. A. No. 89–135 Erie.**

United States District Court, W.D. Pennsylvania.

May 14, 1992.

Irving O. Murphy, T. Warren Jones, Matthew W. McCullough, Mark J. Shaw, MacDonald Illig Jones & Britton, Erie, Pa., for plaintiff.

James R. Fryling, Marsh Spaeder Baur Spaeder & Schaaf, Erie, Pa., John P. O'Dea, Jeanne Ward Ryan, Lawrence C. Norford, Stradley Ronon Stevens & Young, Philadelphia, Pa., for defendants.

Milton Mende, pro se.

## MEMORANDUM OPINION

MENCER, District Judge.

Plaintiff First National Bank ("FNB") has brought this action alleging that defendants participated to various degrees in a scheme to defraud involving the sale of financial guaranty insurance to FNB. The case is before the court presently on FNB's Motion for Partial Summary Judgment on certain of its state law claims; and on the Motion for Partial Judgment on the Pleadings filed by Sedgwick James of Minnesota, Joseph W. Steman, and Daniel M. Militzer (hereinafter referred to collectively as "the James defendants") based on the contention that the facts alleged in the complaint indicate that the RICO count is preempted by the McCarran–Ferguson Act.

## I. STATEMENT OF THE FACTS

FNB alleges that in 1984 it received a credit application from Great Lakes Properties Corporation for a $1,750,000.00 loan to develop property located in Conneaut, Ohio. The FNB loan officer rejected the application because Great Lakes' credit was not sufficiently established to warrant such a sizable loan. As a result of this rejection, Mr. Larry Mako, the president of Great Lakes, met with Mr. Lyle Wheatley, a self-employed commercial loan broker. Wheatley suggested that Mako could probably obtain the loan if his application was backed by a credit enhancement insurance policy, a surety-type arrangement in which the insurer guaranteed payment to the lender if the borrower defaulted. Wheatley suggested the services of the Commonwealth Insurance Group, Inc. Wheatley had earlier visited Commonwealth's offices in Los Angeles and met with Milton Mende, who controlled Commonwealth.

Armed with this new information, Mako along with Wheatley arranged a second meeting with FNB. Mako explained to the FNB loan officer, Harry McDowell, the broad terms of the proposed arrangement. Mr. McDowell indicated that FNB would reconsider the denial of the loan in light of the new proposed terms.

After Wheatley secured Commonwealth's agreement to write the credit enhancement guaranty policy, Mako submitted a new application to FNB along with the Commonwealth policy. Jackson Stacey, an employee of Commonwealth and of the Los Angeles office of the Hartford Insurance Company, sent McDowell information about Commonwealth's credit enhancement guaranty policies, including a specimen copy of the policy. James of Minnesota was listed on the specimen as the claims notification agent for Commonwealth. (Commonwealth was incorporated off-shore). McDowell submitted the specimen to FNB's counsel, who thought that the terms did not sufficiently protect FNB. This reaction, along with McDowell's conviction that Commonwealth did not itself appear to be financially strong, prompted McDowell to reject the application a second time.

Wheatley informed Jackson Stacey at Commonwealth of FNB's refusal. Stacey suggested that FNB might accept the deal if the Commonwealth policy were reinsured by a larger insurance company. He gave Wheatley the telephone number of Joseph Steman, a senior vice president at James of Minnesota. Wheatley contacted Steman, who said during the course of their first conversation that James would provide the reinsurance for Commonwealth. It appears that Steman then forwarded a specimen copy of the letter James of Minnesota typically sent regarding the acquisition of reinsurance for Commonwealth.

Some time after receiving this information, Mr. McDowell decided to offer the loan to Great Lakes subject to certain conditions. In a commitment letter sent to Mr. Mako on January 9, 1985, Mr. McDowell listed among the conditions of the loan a requirement that the Commonwealth Insurance Group provide a credit enhancement guaranty insurance policy "to be reinsured by the Fred S. James Company through an insurance company acceptable to [FNB]."

Mr. McDowell claims that he spoke to Mr. Steman at James of Minnesota a number of times following the issuance of the commitment letter. One of the primary issues discussed was a proposed change in the specimen letter in which James stated its commitment to find a reinsurer for the Commonwealth policy. In the specimen letter, James of Minnesota promised to "undertake with responsibility to obtain reinsurance." FNB wanted a stronger commitment and requested that the letter state that James "will obtain" the reinsurance. On February 6, 1985, Steman wrote a letter to FNB which stated that James "will obtain" the reinsurance.

The following month, a few days prior to the scheduled March 6 closing date for the loan, Mr. McDowell made a number of calls to Mr. Steman in which he inquired when James was going to obtain the reinsurance. According to the deposition testimony of Mr. McDowell, Mr. Steman first indicated that he was working on obtaining the reinsurance and stated that it would be in place before the loan closed. However, during a subsequent conversation, Mr. Steman told Mr. McDowell that he could not get the reinsurance until after the loan closed and the paperwork was completed. On March 6, 1985, the parties signed the loan agreement.

Although James had not obtained the reinsurance by this time, the Commonwealth guaranty was effective. Great Lakes paid $52,500 to Bribacor, Inc., another Mende-controlled corporation, for the Commonwealth policy. Subsequently, on April 10, 1985, Bribacor sent James of Minnesota a check in the amount of $3,975 for its participation in the Great Lakes deal.

James never obtained the reinsurance. In March, 1986, Jackson Stacey sent a letter to Mr. McDowell stating that Commonwealth no longer employed James as its reinsurance broker and had replaced James with the Boston office of Frank B. Hall & Company. In the letter, Mr. Stacey assures FNB that Commonwealth is strong enough to handle the policy, even though it had been unable to place this particular policy among the other "blocks of reinsurance" that backed their other policies. Mr. McDowell stated in his deposition that he spoke to Mr. Stacey after receiving this

letter and that he got the impression from Mr. Stacey that Commonwealth itself would acquire an "investment grade rating from a rating service" in order to meet its obligation to acquire reinsurance from a company rated A:XII.

On February 12, 1987, FNB issued a second loan in the amount of $865,000 to Great Lakes. Commonwealth agreed to increase the amount of coverage under its credit enhancement insurance guaranty from $1.75 million to $3.2 million to secure the loan. In addition, the parties entered into an agreement in which the British Indemnity Group, Inc., yet another Mende-controlled entity, would provide a "cut-through" corporate guaranty. The effect of this "cut-through" endorsement was to permit FNB to seek payments from British Indemnity as well as Commonwealth should Great Lakes default on the loan.

Soon thereafter, in May of 1987, Great Lakes defaulted on the loans. FNB gave notice of the default to the Geary Steffen Company, the claims notification company that replaced James of Minnesota in 1986. Commonwealth acknowledged receipt of the notice of default. When Great Lakes failed to repay the default, FNB wrote to Commonwealth stating that it was awaiting a response from Commonwealth and British Indemnity regarding its demand for payment. Neither company ever honored the demand for payment.

In February 1991, Milton Mende along with several other of his fellow officers and employees were indicted by a Grand Jury in the United States District Court for the Central District of California. They were charged with multiple counts of criminal conspiracy, mail fraud, wire fraud, and possession of forged U.S. Government securities. The indictment recites that Commonwealth Insurance Group and British Indemnity Group, along with several other Mende-controlled organizations, were essentially "dummy organizations" that possessed no assets other than the amounts received from their criminal enterprise.

Although there has been no evidence presented that FNB had any knowledge of the true nature of Commonwealth and British Indemnity, certain individuals within the national organization of the Fred S. James organization did come to learn that these companies were part of a fraud. On October 18, 1985, after FNB made the first loan to Great Lakes but prior to the second loan, Mr. William C. Thomas, President of James of Arkansas, sent a letter to the Chairman of James of Missouri in which he states his concern regarding James of Minnesota's involvement with Commonwealth, although he makes clear that he is not certain that Commonwealth was involved in any wrongdoing. On February 10, 1986, Mr. M.R. Mead issued a file memorandum on "James—Central Region" stationery. He states that "shortly after" the third quarter of 1984 the James organization became aware that Commonwealth was run by Milton Mende, and that Mende was a convicted felon. James ordered that the organization cease all business activity with Commonwealth and Mende at that time. He learned from a confidential source during the fourth quarter of 1985 that Mr. Steman was continuing a relationship with Commonwealth. A James of Minnesota employee conducted an interview with Mr. Steman and an investigation of James' dealings with Commonwealth and concluded that James had no financial involvement. Mr. Mead concludes his memorandum by stating that James had no knowledge that its name was being used and he denies any liability as a result of Mr. Steman's actions.

## II. ANALYSIS

### A. *FNB's Motion for Partial Summary Judgment*

FNB contends that it is entitled to a partial summary judgment that the conduct of James and of Joseph Steman violates two Pennsylvania insurance law provisions. A party is entitled to summary judgment if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Peters Township School Dist. v. Hartford Acc. and Indem.*

*Co.,* 833 F.2d 32, 34 (3d Cir.1987). A genuine issue exists only if the evidence is such that a reasonable jury could find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Equimark Commercial Fin. Co. v. C.I.T. Fin. Serv. Corp.,* 812 F.2d 141, 144 (3d Cir. 1987). In reviewing the facts of the case contained in the evidential record, a court deciding a motion for summary judgment should view the facts in the light most favorable to the party opposing the motion. *Goodman v. Mead Johnson & Co.,* 534 F.2d 566, 573 (3d Cir.1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977).

FNB first contends that the alleged conduct violated the Pennsylvania Surplus Lines Act, 40 Pa.Stat.Ann. § 1006.1 *et seq.* Although this statute has not been interpreted to provide a private cause of action, FNB contends that a violation of the surplus lines act constitutes negligence per se. The relevant portion of the statute provides:

> No person in this Commonwealth shall directly or indirectly act as agent for, or otherwise represent or aid on behalf of another, any insurer not licensed to transact insurance in this Commonwealth in the solicitation, negotiation, procurement or effectuation of insurance, or renewals thereof, or forwarding of applications, or delivery of policies or contracts or inspection of risks, or fixing of rates, or investigation or adjustment of claims or losses, or collection or forwarding of premiums, or in any other manner represent or assist such insurer in the transaction of insurance.

40 Pa.Stat.Ann. § 1006.3(a).

Because James was licensed to act as an insurance agent within the Commonwealth of Pennsylvania at the time this cause of action arose, James satisfies the require-ment that the actor be a "person in this Commonwealth." A more controversial proposition is whether James functioned as an agent or otherwise represented or aided Commonwealth in the sale of the credit enhancement guaranty insurance. FNB identifies two functions that James performed for Commonwealth. First, James acted as Commonwealth's claims notification agent. If a claim arose against the Commonwealth policy, the insured would have been required to give notice of the claim to James, who would have forwarded the information to Commonwealth. Second, James agreed to find a company with a specified credit rating either to reinsure or to accept Commonwealth as a reinsurer.

FNB argues that James was either functioning as an insurance agent on behalf of Commonwealth, or that it was "otherwise aiding or representing" Commonwealth. In its capacity as claims agent, James aided Commonwealth by gathering and passing along information relative to claims made on Commonwealth's policies. More important, FNB argues that James' promise to provide a reinsurer for Commonwealth served a very important function in this transaction as well as other Commonwealth transactions in which James allegedly took part.

James concedes that it was the claims notification agent on the Commonwealth policy, but argues that it was never called upon to perform any functions in that capacity. Accordingly, it argues that it should not be held to have aided or represented Commonwealth in that capacity. Furthermore, James contends that any steps that it took to procure reinsurance for the Commonwealth policy is irrelevant to the question of whether its action violated the Surplus Lines Insurance Act: 40 Pa.Stat.Ann. § 1006.5(2) excludes reinsurance from the purview of the statute.[1]

---

1. 40 Pa.Stat.Ann. § 1006.5 provides in relevant part:
   *Exclusions*
   The provisions of this act shall not apply to the following:

   . . . . .

   (2) Reinsurance; . . .

■ Although it seems to the court that James' functioning as the claims notification agent furthered the transaction to only a marginal degree, minimal aid is all that the statute requires. The language of section 1006.3 is extremely expansive: it applies regardless of whether the agent function is direct or indirect; regardless of whether an actual agency relationship has been established; and it is intended to apply if the entity has "in any manner" represented or assisted an insurer in the transaction of insurance. Even if James was never called upon to notify Commonwealth of any claims against it, Commonwealth received the benefit of having a claims notification agent in place during that time. Thus, on the basis of the claims notification function alone, James has violated section 1006.3.

Similarly, James' commitment to obtain reinsurance for the Commonwealth policy is a violation of section 1006.3. Mr. McDowell's unrebutted testimony establishes that Mr. Steman was aware that FNB had reservations regarding the reliability of the Commonwealth policy without reinsurance. Thus, James' promise to find reinsurance obviously meets the minimal standards that the contested conduct have "in any manner" assisted the insurer in the transaction of insurance. James' objection that the Surplus Lines Act is inapplicable to reinsurance is not well taken because this case involves the alleged unauthorized sale of credit enhancement guaranty insurance, not reinsurance. The statute prohibits any assistance in the unauthorized sale of, *inter alia*, credit enhancement guaranty insurance. To that end, it prohibits any manner of assistance, including a promise to obtain reinsurance on the transaction. The situation would be different if James had in some manner assisted Commonwealth in an attempt to sell reinsurance. In such a case, section 1006.5(2) would prevent the application of the Surplus Lines Act.

■ Although FNB has established that James' conduct violated the Surplus Lines Act, more is needed before FNB establishes that the conduct is negligence per se. Just as is the case with the "ordinary" negligence action, the plaintiff in an action based on a theory of negligence per se must establish that there exists proximate causation between the breach of duty and damages. *Kaplan v. Philadelphia Trans. Co.*, 404 Pa. 147, 171 A.2d 166, 167 (1961); *Commonwealth v. Hickey*, 136 Pa.Commw. 223, 582 A.2d 734, 736 (1990). The legal doctrine of proximate cause indicates that in order for liability to exist, there must be more than "but for" causation. *Whitner v. Von Hintz*, 437 Pa. 448, 263 A.2d 889, 893 (1970). Rather, the complained-of conduct must have represented a "substantial factor" in bringing about the harm. *E.g.*, *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 366–67 (3d Cir.1990); *Burnside v. Abbott Laboratories*, 351 Pa.Super. 264, 505 A.2d 973, 978–79 (1985).

The Pennsylvania courts have rightfully perceived that the question of what constitutes a substantial causal factor is essentially a factual question, not a legal one. Accordingly, summary judgment on this question should be denied if a jury could reasonably differ as to whether the defendant's conduct was a substantial cause of the injury. *Ford v. Jeffries*, 474 Pa. 588, 379 A.2d 111, 112 (1977). And, of course, if any material questions of fact remain at the time that the motion for summary judgment is brought, the motion must be denied. *E.g.*, *Schreffler v. Birdsboro Corp.*, 490 F.2d 1148, 1154 (3d Cir.1974).

The evidence in this case regarding causation is not so convincing to warrant taking the question from the jury. FNB's decision to proceed with the closing of the loan without any reinsurance on the Commonwealth policy belies its claim that it would never have entered into the insurance transaction with Commonwealth without James' assurances that it would obtain the reinsurance. In addition, FNB did not subsequently declare the Great Lakes' loan to be in default because of James' failure to obtain the reinsurance. Furthermore, FNB subsequently extended more credit to Great Lakes, again secured with a Commonwealth credit enhancement guaranty policy and without any reinsurance. A jury could reasonably conclude from these facts that James' promise to obtain a rein-

**416**

surer did not significantly influence FNB's decision to grant the loan to Great Lakes.

■ FNB also claims that the James defendants conduct violated section 235 of the Insurance Department Act of 1921. Section 235 provides:

An insurance agent shall be personally liable on all contracts of insurance or suretyship unlawfully made by or through him, directly or indirectly, for or in behalf of any company, association, or exchange not authorized to do business in this Commonwealth. Any person soliciting risks, forwarding premiums, or countersigning or delivering policies, shall be deemed to be the agent of the company, association, or exchange, within the meaning of this section.

40 Pa.Stat.Ann. § 235. Unlike the Surplus Lines Act which encompasses conduct that can be said to have "in any manner" represented or assisted an insurer in the transaction of insurance, section 235 applies only if the defendant is an "insurance agent" within the meaning of section 231. FNB argues that James was functioning as Commonwealth's insurance agent as that term is used in the Insurance Department Act. The term insurance agent is given a specific meaning in Pennsylvania's scheme for regulating insurance. An insurance agent is:

[An] ... individual ... or corporation, not a duly licensed insurance broker, who, for or without compensation, solicits insurance on behalf of any insurance company ..., or transmits ... an application for a policy of insurance to or from such company ... or offers or assumes to act in the negotiation of such insurance, or in any manner, aids in transacting the exchange by negotiating for or placing risks ... for such company ... shall be an insurance agent within the intent of the act ...

40 Pa.Stat.Ann. § 231. FNB contends that the James defendants functioned as insurance agents for Commonwealth because they "offered or assumed to act in the negotiations" of the Commonwealth policy by agreeing to obtain reinsurance for the benefit of FNB. FNB posits that this same conduct constituted aid in transacting insurance business by negotiating for or placing risks for Commonwealth because the promised reinsurance would have shared Commonwealth's risk of loss.

■ Although FNB has presented evidence that the James defendants agreed to find a reinsurer for the Commonwealth policy, the evidence does not yet establish that the James defendants were functioning as insurance agents for Commonwealth. The statutory language indicates that a party must in some fashion have "offered or assumed to act in the negotiations" of an improper insurance transaction, or have "aided in transacting the exchange by negotiating for or placing risks." This language indicates that at bare minimum James must have intended that its offer of services influence the outcome of the underlying negotiations for the credit enhancement guaranty policy. Or, stated differently, there must have existed some sort of relationship between James and Commonwealth.

One possible view of the evidence in this case is that the James defendants agreed, upon solicitation by Mr. Wheatley in his capacity as agent for Mr. Mako, to find reinsurance for this particular transaction. If such was the case, and if there were no evidence establishing an ongoing relationship between James and Commonwealth, then it would be improper to conclude that finding reinsurance constituted acting in the negotiations because James' role would have been essentially a passive one. There is admittedly circumstantial evidence that some sort of business relationship existed between Commonwealth and James of Minnesota: James agreed to write letters promising to find reinsurance on the Commonwealth policy; Bribacor, a Mende-controlled entity, paid James a fee for its services in connection with the Great Lakes loan; and, significantly, Bribacor also paid James fees on other similar transactions. Nevertheless, this evidence does not foreclose the possibility that James was acting on behalf of Great Lakes and Mr. Mako

rather than in connection with Commonwealth.[2]

Therefore, the court concludes that FNB has not met its initial burden of demonstrating that there is an absence of a question of material fact on the counts based on the Surplus Lines Act and the Insurance Department Act of 1921 under Rule 56 of the Federal Rules of Civil Procedure. By the same token, however, FNB has established that James' function as claims notification agent combined with its promise to find reinsurance for the Commonwealth policy at least incidentally aided in the transaction. This conduct constitutes a violation of the Surplus Lines Act. The court will therefore enter a partial summary judgment reflecting this determination.

### B. *James Defendants' Motion for Partial Judgment on the Pleadings*

■ The James defendants have filed a motion for partial judgment on the pleadings to strike a count in the Amended Complaint that alleges violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, against defendants James of Minnesota, Steman, Daniel Militzer, Milton Mende and Jackson Stacey. The James defendants argue that because the operative facts of this case involve alleged misdeeds in the offer and sale of insurance, only state law claims may be brought. The source of this assertion is the McCarran–Ferguson Act, 15 U.S.C. § 1011 *et seq.*, which states in relevant part:

(a) The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.

(b) No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business unless such Act specifically relates to the business of insurance ...

15 U.S.C. § 1012.

Congress enacted the McCarran–Ferguson Act in 1945 in response to the Supreme Court's ruling in *United States v. South–Eastern Underwriter's Assoc.*, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944), which held that the insurance industry was within the category of national commerce and reversed a dismissal of a federal indictment that alleged violations of the federal antitrust laws committed by several insurance companies. The McCarran–Ferguson Act restored the power of the states to regulate the business of insurance. Significantly, Congress rejected proposals to create an absolute exemption for the insurance industry from federal regulation. *See* Weller, "To Preempt or to Accommodate: The Question of State and Federal Antitrust Laws Under the McCarran–Ferguson Act," 9 *U.Tol.L.Rev.* 421 (1978); Weller, "The McCarran–Ferguson Act's Antitrust Exemption for Insurance: Language, History and Policy," 1978 *Duke L.J.* 587.

■ Instead, the McCarran–Ferguson Act sets up a scheme whose primary purpose is to preserve state regulation of the insurance industry. In addition, however, the statute preempts federal laws not specifically directed at the insurance industry if the application of those laws would unduly interfere with a particular state's scheme for regulating insurance. The statute presents four separate issues that must be addressed before a proper determination regarding preemption can be made: (1) does the federal law specifically relate to the business of insurance; (2) does the challenged activity constitute the "business of insurance"; (3) is there a state law that regulates the challenged activity; and (4) would the application of the federal law invalidate, impair, or supersede the state law that regulates the challenged activity. *Mackey v. Nationwide Ins. Co.*, 724 F.2d 419, 421 (4th Cir.1984); *Cochran v. Paco, Inc.*, 606 F.2d 460, 464–66 (5th Cir.1979);

---

**2.** FNB does not contend that James' agreement to function as claims notification agent constitutes a violation of the Insurance Department Act.

*Brownell v. State Farm Mut. Ins. Co.*, 757 F.Supp. 526, 534 (E.D.Pa.1991).

■ Turning to the facts of this case, the court is asked to strike a count in the Complaint that alleges violations of RICO. The first question presented is whether RICO "specifically relates" to the business of insurance. As noted in this court's earlier decision in *Senich v. Transamerica Premier Ins. Co.*, 766 F.Supp. 339 (W.D.Pa. 1990), the RICO statute makes no express reference to the insurance business. *Id.* at 340. Furthermore, as FNB establishes in its brief in opposition to this motion, the declared purpose of RICO was the "eradication of organized crime in the United States." *United States v. Turkette*, 452 U.S. 576, 589, 101 S.Ct. 2524, 2532, 69 L.Ed.2d 246 (1981). Although certainly laws directed at organized crime might encompass practices in the insurance industry, it would be improper to find that RICO specifically relates to the business of insurance unless the statute made reference to insurance or in some fashion specifically addressed practices integral to the insurance industry. Because RICO contains no such provisions, it does not relate specifically to the business of insurance. Thus, RICO falls within that category of statutes that are subject to preemption by the McCarran–Ferguson Act if the other conditions outlined above are met.

The second question presented by the McCarran–Ferguson preemption analysis is whether the challenged practice involves the "business of insurance." This is the portion of the statute upon which the Supreme Court has most often based decisions holding that preemption is not appropriate under the McCarran–Ferguson Act. *E.g., Securities and Exchange Comm'n v. United Ben. Life Ins. Co.*, 387 U.S. 202, 87 S.Ct. 1557, 18 L.Ed.2d 673 (1967) (variable annuity contracts are investment schemes, not the business of insurance); *Securities and Exchange Comm'n v. National Securities, Inc.*, 393 U.S. 453, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969) (merger of two insurance companies does not constitute the business of insurance); *Union Labor Life Ins. Co. v. Pireno*, 458 U.S. 119, 102 S.Ct. 3002, 73 L.Ed.2d 647 (1982) (insurer's use of peer review committee to determine reasonableness of chiropractor's fees is not the business of insurance); *but see Federal Trade Comm'n v. Nat. Cas. Co.*, 357 U.S. 560, 78 S.Ct. 1260, 2 L.Ed.2d 1540 (1958) (advertising practices of insurance companies are the business of insurance).

■ In certain cases, this one included, the analysis of whether a given practice constitutes the business of insurance presents a difficult threshold question: what precisely is the "practice" that is under scrutiny? The James defendants claim that the practice in question is the offer and sale of credit enhancement guaranty insurance policies. FNB argues that the conduct at issue is a nation-wide scheme to induce bank lenders to extend credit to otherwise unqualified borrowers through the sale of worthless surety-type policies to the borrowers.

In cases of this sort where the practice that gives rise to the cause of action involves an element of insurance in addition to other practices not necessarily related to insurance, the courts have tended to characterize the dispute in its narrowest terms by including all the elements making up the dispute. In *Federal Trade Comm'n v. Manufacturers Hanover Consumer Serv.*, 567 F.Supp. 992 (E.D.Pa.1983), the Federal Trade Commission brought a suit against several lenders, claiming that these lenders misrepresented to borrowers that in order to obtain credit they were required to purchase credit insurance. The court held that practice essentially involved the narrow issue of whether there was misrepresentation concerning the requirement to purchase credit insurance; the case did not implicate the actual relationship between insurer and insured. "Where possible to characterize the practice either broadly so that the activity appears to be part of the relationship between the insurer and insured, or narrowly so that it appears to be otherwise, the latter path should be followed." *Id.* at 995. *See Federal Trade Comm'n v. Dixie Finance Co.*, 695 F.2d 926 (5th Cir.1983); *Elliott v. ITT Corp.*, 764 F.Supp. 102 (N.D.Ill.1991) (both reach-

ing same result as *Manufacturers Hanover* court).

A case involving even more strikingly similar facts is *Washburn v. Brown*, 1986 WL 7062 (N.D.Ill. June 17, 1986). In that case, the Illinois Insurance Director sued officers of an insurance company alleging, *inter alia*, violations of RICO. The insurance company allegedly engaged in a scheme in which different policies were secretly shifted among various subsidiaries of the company, which created the illusion that the company was solvent when in fact it was highly undercapitalized in proportion to the number of policies it had written. The complaint alleged that the officers had engaged in a scheme to defraud the policyholders and the company's shareholders. Although the defendants urged that the practice in question was the offer and sale of reinsurance, the court disagreed and characterized the practice as mail fraud. The court found that mail fraud was not the business of insurance and held that the RICO claims were not barred by the McCarran–Ferguson Act.

This court agrees with the approach taken by the *Manufacturers Hanover* and *Washburn* courts. This case involves more than a straightforward insurance transaction: there is an allegation of an ongoing nation-wide scheme on the part of the defrauding insurer to find borrowers who could not obtain credit and to serve as a surety on their behalf to unsuspecting lenders.[3]

Having properly formulated the practice at issue, all that remains is to evaluate this practice in light of the criteria for determining whether a given practice constitutes the "business of insurance" under the

McCarran–Ferguson Act set forth by the Supreme Court in *Union Labor Life Ins. Co. v. Pireno*, 458 U.S. 119, 102 S.Ct. 3002, 73 L.Ed.2d 647 (1982). The *Pireno* Court identified three factors:

> first, whether the practice has the effect of transferring or spreading a policyholder's risk; second, whether the practice is an integral part of the policy relationship between the insurer and the insured; and third, whether the practice is limited to entities within the insurance industry.

458 U.S. at 129, 102 S.Ct. at 3009. The fraudulent practice alleged to have occurred in this case satisfies none of the three criteria identified in *Pireno*. First, because Commonwealth had essentially no assets, the guarantee to pay if Great Lakes defaulted was worthless and no risk shifted from FNB to Commonwealth.[4] Second, a scheme to defraud plays no role in the typical policy relationship between the insurer and the insured. Third, there is no reason to conclude that only an entity within the insurance industry could engage in such a practice. Both insurance companies as well as other types of companies engage in the sale of credit enhancement guaranty policies. *See* Freedman, "Financial Guarantees: Too Hot to Handle?," *Best's Rev. Property/Casualty Ed.* 16, 132 (Oct. 1985); Note, "Financial Guaranty Insurance: Is It "The Business of Insurance" Under the McCarran Act?," 1988 *Colum.Bus.L.Rev.* 855, 857. Furthermore, it is a debatable proposition whether Commonwealth should properly be classified as an "entity within the insurance industry."

Thus, the alleged fraudulent conduct at issue in this case does not constitute the business of insurance under the McCarran–Ferguson Act. Because no business of in-

---

**3.** The James defendants object to the court's consideration of any evidence which does not correspond to an allegation in the Amended Complaint because their motion is styled as a Judgment on the Pleadings. Without addressing the merits of this somewhat formalistic argument, the court is content to note that its decision would be the same even if there were no evidence that the Commonwealth defendants or the James defendants had previously engaged in similar schemes to defraud other lenders. What differentiates this case from a standard insurance practice is the allegation of fraud, not the patterns of ongoing fraud characteristic of

RICO. The Amended Complaint plainly alleges fraud.

**4.** It might be argued that Commonwealth's conduct did result in risk shifting in that FNB did acquire a cause of action against Commonwealth and its officers once it failed to make good on the guaranty. However, as *Pireno* makes clear, it is not any type of risk spreading that satisfies this test. Rather, it is "the transfer of risk characteristic of insurance." 458 U.S. at 130, 102 S.Ct. at 3009.

surance is at issue in this case, the McCarran–Ferguson Act does not apply; there is no need to consider the other issues presented by a McCarran–Ferguson preemption analysis.

An appropriate order will follow.

### ORDER

AND NOW, this 14th day of May, 1992,

IT IS HEREBY ORDERED that the Motion for Partial Summary Judgment filed by the Plaintiff, the First National Bank of Pennsylvania, is GRANTED IN PART and DENIED IN PART. It is adjudged that the conduct of Defendants Sedgwick James of Minnesota, Joseph W. Steman, and Daniel M. Militzer violated 40 Pa.Stat.Ann. § 1006.3(a). In all other respects, said motion is denied.

IT IS FURTHER ORDERED that the Motion for Partial Judgment on the Pleadings filed by Defendants Sedgwick James of Minnesota, Joseph W. Steman, and Daniel M. Militzer is DENIED.