**Nancy L. AMBROSE, Habib Guirguis, and Richard Grant Bird, Plaintiffs,**

v.

**BLUE CROSS & BLUE SHIELD OF VIRGINIA, INC., a/k/a Trigon Blue Cross Blue Shield, and HMO of Virginia Inc., and Healthkeepers, Inc., a/k/a Healthkeepers of Virginia, Inc., Defendants.**

Civ. A. No. 3:94cv636.

United States District Court, E.D. Virginia, Richmond Division.

June 27, 1995.

---

Richard T. McGrath, Kane, Jeffries, Foreman & Gayle, Richmond, VA, Irwin W. Stolz, Gambraell & Stolz, Atlanta, GA, Gene M. Winburn, Winburn, Lewis & Barrow, Athens, GA, for plaintiffs.

Thomas E. Martenstein, Jeanette D. Rogers, Blue Cross & Blue Shield of Virginia Legal Dept., James C. Roberts, Mays & Valentine, R. Gordon Smith, James P. McElligott, Jr., James B. Comey, McGuire, Woods, Battle & Boothe, Richmond, VA, for defendants.

## MEMORANDUM OPINION

PAYNE, District Judge.

The Amended Class Action Complaint ("Amended Complaint") contains five counts. In Counts One and Two, Richard G. Bird, and the class he purports to represent, assert claims under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001–1461 ("ERISA"). These two counts have been voluntarily dismissed. Consequently, Bird is no longer a plaintiff and there are no ERISA claims remaining. Count Three is asserted by Nancy L. Ambrose and Habib Guirguis, and the classes they purport to represent, under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968 ("RICO"). In Count Four, the Ambrose and Guirguis Classes assert Virginia state law claims for breach of contract, failure to account and breach of fiduciary duty. Count Five, for reasons not entirely clear, seeks injunctive relief respecting adjustments of allegedly improperly calculated policy holder lifetime benefit caps.

The defendants are three corporations: Blue Cross & Blue Shield of Virginia, Inc., now known as Trigon Blue Cross Blue Shield, Blue Cross Blue Shield HMO of Virginia, Inc. ("HMO Virginia"), and Healthkeepers, Inc. ("Healthkeepers"). HMO Virginia and Healthkeepers are wholly owned subsidiaries of Trigon. The defendants, who will be referred to collectively as "defendants" or "Trigon," have moved to dismiss the action pursuant to Fed.R.Civ.P. 9(b), 12(b)(1), and 12(b)(6), and they claim entitlement to summary judgment pursuant to Fed. R.Civ.P. 56(b).

With the voluntary dismissal of Counts One and Two, RICO provides the only basis for federal jurisdiction and hence resolution of Count Three has become the focal point of this action. The defendants assert that Count Three fails as a matter of law because the application of RICO is precluded by the McCarran–Ferguson Act, 15 U.S.C. §§ 1011–1015. If the defendants' contention is correct, then dismissal is appropriate pursuant to Fed.R.Civ.P. 12(b)(6).

## STATEMENT OF FACTS

The stated facts will be confined to those that are pertinent to the RICO claims asserted by Ambrose and Guirguis. The statement of facts assumes that the allegations of the Amended Complaint are true even though the defendants deny many of those allegations.

### A. The Policies, the Plaintiffs and the Offending Practices

The insurance policies issued by Trigon and purchased by Ambrose and Guirguis contained, as is standard in the insurance industry, provisions establishing annual deductible thresholds which must be reached before the insurer is obligated to make payments to the health care provider or to reimburse amounts paid by the insured. The "deductible" is that "portion of an insured loss to be borne by the insured before he is entitled to recovery from the insurer." Black's Law Dictionary 413 (6th ed. 1990). The policies also contain copayment provisions which allocate the risk between the insured and the insurer by establishing the percentage of medical charges for which each is responsible after the deductible is exhausted. The plaintiffs entered the insurance contracts as a result, in part, of mail-out marketing and advertising campaigns. Those documents, and other literature delivered with the policy and with correspondence about claims, are said to have misrepresented the truth about the amount of risk borne by the insured and insurer, respectively.

More particularly, the RICO claim charges that the defendants devised and effectuated a discounting scheme under which the respective risks borne by insured and insurer were different than represented in connection with the sale, purchase and performance of the insurance contract. As the plaintiffs put it:

Plaintiffs allege that the *defendants,* unknown to their customers, had *struck secret deals with* preferred health care *providers for discounts* generally based upon the annual volume of billings generated by Blue Cross customers and their beneficiaries under their contract documents. These *discounts would arise from the Deductible amounts paid and the copay-*

*ments made but they would only be applied to the defendants' share of the bills, not the risk retained by the participant* and the bills paid by participants in its health plans.

(Amended Complaint, pp. 3–4) (emphasis added). The effect of these practices on the Ambrose class was somewhat different from the effect on the Guirguis Class.

The Ambrose Class consists of insureds whose contracts provided that the insurers "would pay, after a Deductible, 80% of certain covered medical charges with a copayment of 20% from the insureds." (Amended Complaint, p. 3). The insureds in the Ambrose Class incurred medical expenses in a given year that exceeded their deductible and therefore they paid copayments according to the terms of their contracts. Because the negotiated discounts were undisclosed, the insured paid 20% of the providers' stated, undiscounted charge. The insurer then paid only the difference between what the insured had paid and the discounted charge. The net result of that practice was that the insured actually paid more than 20% of the amount owed to the health care provider after exhaustion of the deductible. Consequently, say the Ambrose Class plaintiffs, the advertisements and representations which the defendants made in connection with the sale of the policies and the performance of the policy obligations were fraudulent because they misrepresented the true share of the risk allocated in the copayment.

For example, let us assume that: (1) an insured, whose policy provides for a $200 deductible and a 20%/80% copayment thereafter, undergoes a procedure after having satisfied the deductible; (2) the provider's stated charge for that procedure is $1,000; (3) the insurer and the provider have negotiated a 40% discount for the procedure; and (4) the insured is informed in the statement from the insurer or the provider that the provider's charge is $1,000, of which the insured is to pay 20%, or $200, leaving the insurer to pay the remaining 80% due the provider. In actuality, however, because the provider charged only $600 (the 40% negotiated discount being $400), the insurer has paid only the remaining $400 of the discount-

ed charge of $600. In other words, the insurer has paid 66.67% of the actual charge when it had represented that it would pay 80%; and the insured has paid 33.33%, rather than 20% as was represented.

In general terms, the insured in the example paid 20% of a sum that was higher than the amount actually owed to the provider and, as a consequence, the insured paid more than 20% of the amount actually charged by the provider. The Ambrose Class plaintiffs contend that the representations made by the defendants as to the allocation of risk were therefore fraudulent.

The injury to plaintiffs in the Guirguis Class is somewhat more difficult to discern because their payments for medical treatment were within the deductible amount and thus they made no copayments.[1] The Guirguis Class plaintiffs allege that:

> [t]he *discounts arose from the total dollar volume of Blue Cross customer traffic at the* participating *providers* and that the *customers* were *given no adjustment* to their bills *corresponding to the discounts* so that such customers were *secretly charged* an *excessive amount for medical services* and were injured by implicit price-fixing of medical service charges. The excessive charges occurred even though the Blue Cross' [sic] defendants' contracts documents with this subclass of individual customers did not provide for a co-payment beyond a deductible amount, but provided instead that the insurer would pay 100% of charges beyond the annual deductible.

(Amended Complaint, p. 6) (emphasis added).[2] In essence, members of the Guirguis Class complain that the price they paid for medical treatment was not discounted and that this resulted in an unnecessarily and artificially high price for medical services, payment of which benefitted the insurer by permitting the insurer to negotiate other favorable discounts.

## B.   This Action and the State Investigation

On August 31, 1994, the Ambrose and Guirguis plaintiffs sought redress of these practices by filing this action which the defendants moved to dismiss on September 21, 1994 and answered on October 3, 1994. At the time, Virginia's State Corporation Commission ("SCC") was concluding its investigation of the discounting practices and, on September 22, 1994, the SCC entered an Order Accepting Offer of Settlement. Under the terms of the settlement, Trigon agreed to pay a fine of $5 million and to implement a Coinsurance Refund Program, pursuant to which it would refund the excessive copayments to Trigon policyholders and to members of its HMO affiliates, including HMO Virginia and Healthkeepers, and to their beneficiaries.

The order entered by the SCC followed a special market report prepared by the SCC's Bureau of Insurance which ensued an extensive study of the discounting practices as to which the plaintiffs now seek relief under RICO. That investigation was conducted pursuant to, and as a part of, a comprehensive state statutory and administrative scheme by which Virginia regulates all insurance business conducted in the Commonwealth. The report concluded that Trigon's discounting practices, including those of which Ambrose and Guirguis complain, violated several provisions of Virginia's insurance laws including the proscriptions against misrepresenting the terms of insurance policies and against unfair claims settlement practices which are found in the Uniform Trade Practices chapter of Virginia's insurance code, Title 38.2.

---

1. In fact, Guirguis' policy did not provide for copayments at any level. "Among the choices of coverages which were offered to Dr. Guirguis, Guirguis chose that level of coverage which provided for Guirguis to pay the first $10,000 of annual medical expenses for himself or for a covered dependent, with the contracting Blue Cross Defendant responsible for the balance of covered charges." (Amended Complaint, p. 3). It is unclear whether the Guirguis Class consists only of insureds with these types of contracts, or whether it includes insureds whose policies provide for copayments, at some level, but who incurred medical expenses that did not exceed the deductible threshold. For purposes of this motion, it is assumed that the Guirguis Class includes both types of insureds.

2. The price-fixing alleged in this paragraph is asserted only as part of the fraud under the RICO claim, not as an antitrust claim.

The original deadline for filing those refund claims was December 7, 1994, but it was extended to January 7, 1995. As of February 1, 1995, Trigon had approved and paid approximately 128,000 claims totaling $21.9 million.[3]

Because of the settlement between the SCC and Trigon and the resulting Coinsurance Refund Program, the parties jointly requested that this action be stayed until March 15, 1995. The stay was entered by Order dated October 6, 1994. As directed in that Order, the plaintiffs filed the Amended Complaint on November 3, 1994 and, on February 1, 1995, the defendants filed their Answer and their Second Motion to Dismiss.

## DISCUSSION

■ When considering a motion under Fed.R.Civ.P. 12(b)(6), the court is required to presume that all factual allegations in the complaint are true and to accord the benefit of all reasonable inferences to the non-moving party. 2A Moore's Federal Practice ¶ 12.07[2.5] (2d ed. 1994). The allegations of the complaint are to be liberally construed and the motion should be granted only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of [the] claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957).

### A. The McCarran–Ferguson Act: An Historical Perspective

Because the McCarran–Ferguson Act is the focal point of this motion, it is helpful to place the Act in historical perspective. Beginning with the Supreme Court's decision in *Paul v. Virginia*, 75 U.S. (8 Wall) 168, 19 L.Ed. 357 (1868), the courts took the position that " '[i]ssuing a policy of insurance is not a transaction of Commerce' . . . subject to federal regulation." *United States Dep't of Treasury v. Fabe*, —— U.S. ——, ——, 113 S.Ct. 2202, 2207, 124 L.Ed.2d 449 (1993) (citing *Paul*, 75 U.S. at 183). Consequently, there existed "an accepted and longstanding understanding as a matter of federalism that

Commerce Clause statutes as passed by Congress did not apply to the 'business of insurance' and that the states had primacy, indeed exclusivity, in the regulation of that business." Davis, *Preclusion of RICO Claims by the McCarran–Ferguson Act*, 14 RICO L.Rpt. 1093 (Dec. 1991).

"The emergence of an interconnected and interdependent national economy, however, prompted a more expansive jurisprudential image of interstate commerce." *Fabe*, —— U.S. at ——, 113 S.Ct. at 2207. The culmination of this jurisprudential evolution occurred in *United States v. South–Eastern Underwriters Ass'n*, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944), in which the Supreme Court displaced the longstanding rule of law articulated in *Paul*, when it held that "[n]o commercial enterprise of any kind which conducts its activities across state lines has been held to be wholly beyond the regulatory power of Congress under the Commerce Clause. We cannot make an exception of the business of insurance." *South–Eastern Underwriters*, 322 U.S. at 553, 64 S.Ct. at 1173.

The Supreme Court's decision in *South–Eastern Underwriters* "was widely perceived as a threat to state power to tax and regulate the insurance industry." *Fabe*, —— U.S. at ——, 113 S.Ct. at 2207. In response to that decision, "Congress moved quickly to restore the supremacy of the States in the realm of insurance regulation. It enacted the McCarran–Ferguson Act within a year of the decision in *South–Eastern Underwriters*." *Fabe*, —— U.S. at ——, 113 S.Ct. at 2207.

The first section of the McCarran–Ferguson Act clearly states the Congressional purpose which prompted enactment of the statute:

> Congress declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States.

---

**3.** The Treasurer of Virginia filed a claim on behalf of persons who were entitled to, but did not, file claims. The record does not reflect the resolution of this effort to have those funds escheat to the Commonwealth under state law.

15 U.S.C. § 1011. As the Supreme Court later explained, "Congress' purpose was broadly to give support to the existing and future state systems for regulating and taxing the business of insurance." *Prudential Ins. Co. v. Benjamin,* 328 U.S. 408, 429, 66 S.Ct. 1142, 1154, 90 L.Ed. 1342 (1946). Congress sought to achieve its purpose "by removing obstructions which might be thought to flow from its own power, whether dormant or exercised, except as otherwise expressly provided in the Act itself or in future legislation." *Id.* at 429–30, 66 S.Ct. at 1154–55.

## B. The Application of the McCarran–Ferguson Act in This Action

■ Bearing in mind the origins and purposes of the McCarran–Ferguson Act, it is important to focus now on the specific statutory provision at issue in this action, 15 U.S.C. § 1012(b) ("Section 2(b)"), which provides:

> No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, *unless such Act specifically relates to the business of insurance:* Provided, That after June 30, 1948, the Act of July 2, 1890, as amended, known as the Sherman Act, and the Act of October 15, 1914, as amended, known as the Clayton Act, and the Act of September 26, 1914, known as the Federal Trade Commission Act, as amended, shall be applicable to the business of insurance to the extent that such business is not regulated by State Law.

15 U.S.C. § 1012 (emphasis added and omitted). Section 2(b) contains two clauses, each of which serves a different purpose. In *Fabe,* the Supreme Court explained this distinction as follows:

As was stated in *Royal Drug,* the first clause of § 2(b) was intended to further Congress' primary objective of granting the States broad regulatory authority over the business of insurance. The second clause accomplishes Congress' secondary goal, which was to carve out only a narrow exemption for "the business of insurance" from the federal antitrust laws.

*Fabe,* —— U.S. at ——, 113 S.Ct. at 2210.

This action does not present an antitrust claim and therefore the second clause of Section 2(b) is not implicated here. Rather, this action turns on the application of the first clause of Section 2(b). More particularly, the issue is whether the first clause of Section 2(b) of the McCarran–Ferguson Act precludes assertion of RICO claims founded on conduct which Virginia has sought to regulate in three sections of the Unfair Trade Practices chapter of her insurance code, specifically: Va.Code §§ 38.2–502, 503 and 510.A.

"[T]he starting point in a case involving construction of the McCarran–Ferguson Act, like the starting point in any case involving the meaning of a statute, is the language of the statute itself." *Fabe,* —— U.S. at —— ——, 113 S.Ct. at 2207–08 (quoting *Group Life & Health Ins. Co. v. Royal Drug Co.,* 440 U.S. 205, 210, 99 S.Ct. 1067, 1073, 59 L.Ed.2d 261 (1979)). According to the Supreme Court, Section 2(b)'s language necessitates three inquiries: (1) does the federal statute at issue "specifically relate to the business of insurance;" (2) was the state statute at issue "enacted for the purpose of regulating the business of insurance;" and (3) would application of the federal statute "invalidate, impair or supersede" the state statute. *Fabe,* —— U.S. at ——, 113 S.Ct. at 2208.[4] The court now addresses each of these inquiries.

---

4. Other courts have employed a four-part test to determine whether the McCarran–Ferguson Act precludes application of a federal statute. Under that approach, the inquiry is whether: (1) the federal statute relates specifically to the business of insurance; (2) the acts challenged under that statute constitute the business of insurance; (3) the state has enacted a law regulating the challenged acts; and (4) the state law would be invalidated, impaired or superseded by application of the federal statute. *See Merchants Home Delivery Service, Inc. v. Frank B. Hall & Co. Inc.,* 50 F.3d 1486, 1489 (9th Cir.1995); *Cochran v. Paco, Inc.,* 606 F.2d 460, 464 (5th Cir.1979); *Everson v. Blue Cross & Blue Shield of Ohio,* No. 93cv7534, 1994 WL 675200, at *10 (N.D.Ohio June 15, 1994); *Forsyth v. Humana, Inc.,* 827 F.Supp. 1498, 1520 (D.Nev.1993); *First Nat'l Bank of Pa. v. Sedgwick James of Minnesota, Inc.,* 792 F.Supp. 409, 417 (W.D.Pa.1992); *Senich v. Transamerica Premier Ins. Co.,* 766 F.Supp. 339, 340–41 (W.D.Pa.1990). However, because the

### 1. RICO Does Not Specifically Relate to the Business of Insurance

The parties agree that RICO does not specifically relate to the business of insurance. Accordingly, there is no further analysis to be made respecting this facet of the test.

### 2. Virginia's Unfair Trade Practices Act is a Law "Enacted ... for the Purpose of Regulating the Business of Insurance" within the Meaning of Section 2(b) of the McCarran–Ferguson Act

#### (a) *The Requisite Analysis*

The Supreme Court has had only two occasions to examine the meaning of the statutory language "any law enacted by any State for the purpose of regulating the business of insurance" in Section 2(b) of the McCarran–Ferguson Act. The Court first addressed this statutory language in *Securities & Exchange Commission v. National Securities, Inc.*, 393 U.S. 453, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969), where it held:

> The relationship between insurer and insured, the type of policy which could be issued, its reliability, interpretation and enforcement—these were the core of the "business of insurance." Undoubtedly, other activities of insurance companies relate so closely to their status as reliable insurers that they to[o] must be placed in the same class. But *whatever the exact scope of the statutory term, it is clear where the focus was—it was on the relationship between the insurance company and the policyholder. Statutes aimed at protecting or regulating this relationship, directly or indirectly are laws regulating the "business of insurance."*

*Id.* at 460, 89 S.Ct. at 568–69 (emphasis added).

Almost a quarter of a century later, the Court addressed the first clause of Section 2(b) for the second time in *United States Dep't of Treasury v. Fabe,* —— U.S. ——, 113 S.Ct. 2202, 124 L.Ed.2d 449 (1993). The issue there was whether an "Ohio law designating the priority of creditors' claims in

insurance-liquidation proceedings," *Fabe,* —— U.S. at ——, 113 S.Ct. at 2205, "is one 'enacted by the State for the purpose of regulating the business of insurance.'" *Id.* at ——, 113 S.Ct. at 2209. The petitioner in *Fabe* minimized the significance of the decision in *National Securities,* instead asserting that the more recent Supreme Court decisions in *Group Life & Health Ins. Co. v. Royal Drug Co.,* 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979) and *Union Labor Life Ins. Co. v. Pireno,* 458 U.S. 119, 102 S.Ct. 3002, 73 L.Ed.2d 647 (1982) provided the criteria against which the "business of insurance" must be judged. *Fabe,* —— U.S. at ——, 113 S.Ct. at 2208. Those criteria are as follows:

> *first,* whether the practice has the effect of transferring or spreading a policyholder's risk; *second,* whether the practice in an integral part of the policy relationship between the insurer and the insured; and *third,* whether the practice is limited to entities within the insurance industry.

*Pireno,* 458 U.S. at 129, 102 S.Ct. at 3009. As the Court explained in *Pireno,* all three factors must be considered together because "[n]one of these criteria is necessarily determinative in itself." *Id.*

The petitioner in *Fabe* contended that the Ohio priority statute was not "enacted ... for the purpose of regulating the business of insurance" because it addressed only the relationship between policyholders and other creditors of the insurance company and satisfied none of the *Pireno* criteria because a law fixing the priority of claims in a bankruptcy proceeding did not transfer risk, was not an integral part of the policy relationship, and was not limited to the insurance industry. *Fabe,* —— U.S. at ——–——, 113 S.Ct. at 2208–09. Rejecting that argument, the Court held that the Ohio priority statute was a law "enacted ... for the purpose of regulating the business of insurance," *Fabe,* —— U.S. at ——, 113 S.Ct. at 2210, to the extent that it was designed to protect the interests of insured in their contractual relationship with their insurers. *Id.* at ——, 113 S.Ct. at 2212. In so doing, the Court distinguished

United States Court of Appeals for the Fourth Circuit has never adopted this four-part test, and because the Supreme Court did not subscribe to it

in *Fabe,* the analytical framework to be used here will be the one used by the Supreme Court in *Fabe.* See *infra* note 5.

*Royal Drug* and *Pireno* on the basis that they "involved the scope of the antitrust immunity located in the *second* clause of § 2(b). We deal here with the *first* clause, which is not so narrowly circumscribed." *Fabe*, ——— U.S. at ———, 113 S.Ct. at 2209. The Court explained the difference between the two clauses of Section 2(b) as follows:

> The language of § 2(b) is unambiguous: the first clause commits laws "enacted . . . for the purpose of regulating the business of insurance" to the States, while the second clause exempts only "the business of insurance" itself from the antitrust laws. To equate laws "enacted . . . for the purpose of regulating the business of insurance" with the "business of insurance" itself, as petitioner urges us to do, would be to read words out of the statute. This we refuse to do.

*Fabe*, ——— U.S. at ——— - ———, 113 S.Ct. at 2209–10. Then, the Court articulated the standard by which to interpret the phrase "enacted . . . for the purpose of regulating the business of insurance" in the first clause of Section 2(b).

> The broad category of laws enacted "for the purpose of regulating the business of insurance" *consists of laws that possess the "end, intention or aim" of adjusting, managing, or controlling the business of insurance.* Black's Law Dictionary 1236, 1286 (6th ed. 1990). *This category necessarily encompasses more than just the "business of insurance."*

*Fabe*, ——— U.S. at ———, 113 S.Ct. at 2210 (emphasis added).

Decisions of lower courts after *Fabe* have evinced some uncertainty whether the *Pireno* test is entirely inapplicable to the analysis required under the first clause of Section 2(b) or whether that analysis must still be applied, albeit more broadly than in *Pireno* and *Royal Drug*. *Compare Colonial Life & Accident Ins. Co. v. American Family Life Assurance Co. of Columbus,* 846 F.Supp. 454, 459 (D.S.C.1994) (*Pireno* criteria are not controlling where only the first clause of Section 2(b) is at issue) *with Merchants Home Delivery Serv., Inc. v. Frank B. Hall & Co., Inc.,* 50 F.3d 1486, 1490 n. 2 (9th Cir.1995) (*Fabe* held that the business of insurance is to be

defined more broadly outside the antitrust area, but that the distinction "is a matter of degree, however, rather than a wholesale change in the inquiry"). This uncertainty apparently stems from the fact that, in *Fabe,* the Court distinguished *Royal Drug* and *Pireno* on the basis that they involved the second clause of Section 2(b) as opposed to the first, while at the same time the Court concluded that "the actual performance of an insurance contract falls within the 'business of insurance,' as we understood that phrase in *Pireno* and *Royal Drug.*" *Fabe,* ——— U.S. at ———, 113 S.Ct. at 2209.

These two facets of the *Fabe* decision can be reconciled by looking at the basis on which the Court distinguished between the first and second clauses of Section 2(b). The *Fabe* majority recognized that the exemption provided in the first clause includes language that is "significantly missing from the second clause." *Fabe,* ——— U.S. at ——— n. 6, 113 S.Ct. at 2210 n. 6. The presence of the word "purpose" in the first clause reflects Congress' intention to grant "the states broad regulatory authority over the business of insurance." *Id.* at ———, 113 S.Ct. at 2210. In contrast, the second clause omits the word "purpose" and, in so doing, carved out "only a narrow exemption for the 'business of insurance' from the federal antitrust laws." *Id.* at ———, 113 S.Ct. at 2210.

Although the *Pireno* analysis was developed in cases addressing the second clause of Section 2(b), it is relevant to the first clause for the limited purpose of defining the business of insurance. However, under the first clause, a state law controls so long as its *purpose,* that is, its "end, intention, or aim," is "adjusting, managing, or controlling the business of insurance." *Fabe,* ——— U.S. at ———, 113 S.Ct. at 2210. "This category necessarily encompasses more than just the 'business of insurance.'" *Id.* Under the second clause, the state law is exempt from the antitrust laws to the extent that the practice regulated is itself the business of insurance. Thus, to the extent that *Pireno* and *Royal Drug* consider whether the *practice* being regulated is itself the business of insurance, their analysis is inapplicable in a

case controlled by the broader first clause of Section 2(b).[5]

### (b) *Application of the Requisite Analysis*

The calculus required by *Fabe* necessitates examination of the applicable state statute to determine whether it was enacted for the purpose of regulating the business of insurance. Thus, it is necessary now to review the pertinent sections of Title 38.2 of the Virginia Code, the 53 chapter statute by which Virginia regulates the business of insurance within its borders.

The statute establishes rules and procedures to be followed in the issuance and performance of insurance policies. Chapter 5 of Virginia's insurance code is entitled "Unfair Trade Practices." Its stated purpose is to "regulate trade practices in the business of insurance in accordance with the intent of Congress as expressed in the McCarran-Ferguson Act ... by defining and prohibiting all practices in this Commonwealth that constitute unfair methods of compensation or unfair or deceptive acts or practices." Va. Code § 38.2–500. To that end, Va.Code § 38.2–502 prohibits misrepresentation of the "benefits, advantages, conditions or terms of any insurance policy." That provision is supplemented by § 38.2–503 which prohibits any "advertisement, announcement or statement containing any assertion, representation or statement relating to (i) the business of insurance ... which is untrue, deceptive or misleading."

Section 38.2–510 is entitled "Unfair claim settlement practices." Subsection 510.A.1 prohibits "[m]isrepresenting pertinent facts or insurance policy provisions relating to coverages at issue." Subsection A.4 prohibits

arbitrary refusal to pay claims. Subsection A.6 prohibits "not attempting in good faith" to make prompt, fair and equitable settlements of a claim. Subsection A.8 prohibits "[a]ttempting to settle claims for less than the amount to which a reasonable man would have believed he was entitled by reference to written or printed advertising material accompanying or made part of an application."

The SCC report charged Trigon with violations of those sections and with violations of § 38.2–316.B which prohibits the use of applications, riders and certificates of insurance unless the forms thereof previously have been filed with the SCC. All of those violations are punishable under § 38.2–218 ($5,000 per knowing violation; $1,000 per inadvertent violation) and are made subject to the SCC's vast adjudicative and injunctive powers by virtue of §§ 38.2–219 and 220.

The provisions of Chapter 5 which Trigon is alleged to have offended do not give rise to a private cause of action. *A & E Supply Co. v. Nationwide Mut. Fire Ins. Co.*, 798 F.2d 669, 674 (4th Cir.1986); *cert. denied,* 479 U.S. 1091, 107 S.Ct. 1302, 94 L.Ed.2d 158 (1987). However, the penalty provisions of Title 38.2 are not exclusive; and, therefore, they are "in addition to and not in substitution for the power and authority conferred upon the courts by general law to impose civil penalties for violation of the laws" of Virginia. Va.Code § 38.2–221.

Under *Fabe,* Va.Code §§ 38.2–502, 503 and 510.A, and the related enforcement provisions in Va.Code §§ 38.2–218–220, are laws "enacted ... for the purpose of regulating the business of insurance" if they "possess the 'end, intention, or aim' of adjusting, man-

---

**5.** Some post-*Fabe* decisions considering the first clause of Section 2(b) have continued to analyze whether the *practice* that is the subject of the federal law constitutes the "business of insurance." *See Merchants Home Delivery Serv., Inc. v. Frank B. Hall & Co., Inc.,* 50 F.3d 1486 (9th Cir.1995); *Everson v. Blue Cross & Blue Shield of Ohio,* 1994 WL 675200 (N.D.Ohio, June 15, 1994). This seems somewhat at odds with the standard clearly articulated in *Fabe,* which requires a court to focus on the *purpose* of the state statute at issue. *Fabe,* — U.S. at —, 113 S.Ct. at 2210. The courts which have followed that approach have used the four-part test developed before *Fabe* to determine whether the McCarran-

Ferguson Act precludes application of a federal statute. *See supra* note 4. The second prong of that test requires the court to ask whether the *practices* challenged under the federal statute themselves constitute the business of insurance. However, *Fabe* seems to require a broader analysis where the first clause of Section 2(b) is at issue because the Court expressly held that the category of laws enacted "for the purpose of regulating the business of insurance ... necessarily encompasses more than just the business of insurance." *Fabe,* — U.S. at —, 113 S.Ct. at 2210. It is for this reason that here the court adheres to the analysis articulated in *Fabe.*

aging or controlling the business of insurance." *Fabe,* —— U.S. at ——, 113 S.Ct. at 2210 (citation omitted).

First, the provisions at issue are part of a statute—Chapter 5—the clearly articulated purpose of which is "to regulate trade practices in the business of insurance." Va.Code § 38.2–500. The stated purpose, of course, is not controlling. It is persuasive, however, for it indicates a legislative intention that the remaining sections of the chapter should serve that purpose.

Second, it is also persuasive that Chapter 5 of Virginia's insurance code is enforceable only by the Commissioner of Insurance and does not create a private cause of action. *A & E Supply Co.,* 798 F.2d at 674. This points emphatically to the construction of Chapter 5 as a law enacted for no purpose other than regulating the business of insurance.

Third, the plain meaning of Va.Code §§ 38.2–502, 503 and 510 shows that the "primary purpose," *Fabe,* —— U.S. at ——, 113 S.Ct. at 2210, of these sections is to regulate the performance of insurance contracts by assuring conformity between representations made by the insurer to the insured and the actual performance of the insurance policies, and between basic principles of fair practices and the actual performance of the policies. In other words, each statute "is designed," *id.* at ——, 113 S.Ct. at 2209, to regulate the representations made to form, and the practices which comprise, the relationship between insurer and insured and the performance of the insurance contract which is the foundation of that relationship.

Under *Securities & Exchange Commission v. National Securities, Inc.,* 393 U.S. 453, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969), laws aimed at "protecting or regulating" the relationship between insurer and insured satisfy the language of the first clause of Section 2(b). *Id.* at 460, 89 S.Ct. at 568–69. It is clear that those provisions of Virginia's insurance code that prohibit an insurer from misrepresenting the terms of a policy and require adherence to fundamental fair business practices when soliciting and performing the

insurance contract are aimed at regulating the relationship between the insurer and insured and protecting the insured in that relationship.[6] It is equally clear that state laws, the purpose of which is to regulate the marketing and performance of insurance policies by prohibiting fraudulent representations and certain unfair trade practices, are laws "enacted ... for the purpose of regulating the business of insurance" as defined in *Fabe.* The marketing and performance of insurance policies undoubtedly falls within the "business of insurance" as that phrase was understood in *Pireno* and *Royal Drug.* How the terms of a policy are represented, and how they are ultimately performed, affects the spreading of risk, is integral to the policy relationship between insurer and insured, and is unique to the insurance industry. Furthermore, because the Supreme Court expressly held in *Fabe* that "the actual performance of an insurance contract falls within the 'business of insurance,'" it would defy all reason to hold that statutes aimed at ensuring that such performance is fair and conforms to the represented terms of the policy are not laws "enacted ... for the purpose of regulating the business of insurance."

Construing a similar statute, the district court in *Colonial Life & Accident Ins. Co. v. American Family Life Assurance Co. of Columbus,* 846 F.Supp. 454 (D.S.C.1994), reached the conclusion that "a state law enacted for the purpose of preventing false advertising by insurance companies is a law enacted 'for the purpose of regulating' the business of insurance." *Id.* at 458. Applying *Fabe,* the court held that "state laws regulating advertising are encompassed within the scope of the first clause of Section 2(b) since advertising clearly appears to the Court to affect the relationship between the insurer and insured." *Id.* at 460. That conclusion applies with equal force in this action because the alleged misrepresentations here were made both in actual correspondence concerning the policy and in advertising.

---

**6.** In fact, *National Securities* expressly states that "[t]he selling and advertising of policies" constitutes the business of insurance. *National Securities,* 393 U.S. at 460, 89 S.Ct. at 568–69.

Consideration of these Virginia statutes in perspective of the instructions given by *National Securities* and *Fabe* makes manifest that they were enacted by Virginia for the purpose of regulating the business of insurance. These statutes, by their terms, are aimed at protecting and regulating the relationship between insurer and insured. They, together with § 38.2–316.B, go directly to control the type of policy issued, as well as to the reliability, interpretation and enforcement of the insurance contract. And, they focus on requiring that performance of the insurance contract be consistent with the representations that induced the relationship. Therefore, in the most fundamental ways, these sections and the related enforcement mechanisms "possess the 'end, intention or aim' of adjusting, managing or controlling the business of insurance." *Fabe,* — U.S. at ——, 113 S.Ct. at 2210 (citation omitted). Hence, those state laws fall within the reach of the first clause of Section 2(b).[7]

### (c) *The Decisions in Tri– State and Custer*

At oral argument on the motion to dismiss, the court asked the parties to file supplemental briefs respecting the impact on the McCarran–Ferguson analysis of the decisions of the United States Court of Appeals for the Fourth Circuit in *Tri–State Mach. Inc. v. Nationwide Life Ins. Co.,* 33 F.3d 309 (4th Cir.1994), *cert. denied,* — U.S. ——, 115 S.Ct. 1175 (1995) and *Custer v. Pan Am. Life Ins. Co.,* 12 F.3d 410 (4th Cir.1993). The plaintiffs responded by arguing that, in those decisions, the Fourth Circuit already has held that state statutes such as the one at issue in this action are not statutes "enacted . . . for the purpose of regulating the business of insurance." The defendants assert that those decisions are not controlling because they involved ERISA, not RICO, and practices not at issue here.

Upon reflection, it seems clear that *Tri–State* and *Custer,* which involved the scope of the Savings Clause of ERISA, do not alter the McCarran–Ferguson analysis dictated by *National Securities* and *Fabe.* ERISA's Savings Clause, which is an exception to the otherwise broad preemptive effect of ERISA, provides in pertinent part that "nothing in this subchapter shall be construed to exempt or relieve any person from any law of any state which *regulates insurance.*" 29 U.S.C. § 1144(b)(2)(A) (emphasis added). As the Fourth Circuit explained in *Tri–State,* "the term 'business of insurance' as used in the McCarran–Ferguson Act has been adopted as the basis for defining the scope of the Savings Clause of ERISA." *Tri State,* 33 F.3d at 314; *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 48–49, 107 S.Ct. 1549, 1553–54, 95 L.Ed.2d 39 (1987); *Metropolitan Life Ins. Co. v. Massachusetts,* 471 U.S. 724, 742–43, 105 S.Ct. 2380, 2390–91, 85 L.Ed.2d 728 (1985).

In *Tri–State,* the Fourth Circuit held that, at least as to the practices there involved (abusive claims processing), the West Virginia Unfair Trade Practices Act did not regulate the "business of insurance;" and, therefore, was not saved from preemption by ERISA's Savings Clause. *Tri–State,* 33 F.3d at 314–15; *see Custer,* 12 F.3d at 419–20. The West Virginia Unfair Trade Practices Act is, in most substantive respects, the same statute as Chapter 5 (Unfair Trade Practices Act) of Virginia's insurance code. Consequently, say the plaintiffs, *Tri–State* and *Custer* require a holding that Chapter 5 of Title 38.2, Virginia's version of the same statute, was not "enacted . . . for the purpose of regulating the business of insurance."

The plaintiff's argument erroneously equates the phrase "business of insurance," which appears in the second clause of Section 2(b) of the McCarran–Ferguson Act and which the Fourth Circuit interpreted in *Tri– State* and *Custer,* with the language "enacted . . . for the purpose of regulating the business of insurance" which is in the first clause of Section 2(b) and which was not before the Fourth Circuit, but which is dispositive here. This is significant because, under *Fabe,* the

---

7. The same result would obtain upon application of the second facet of the four-part test applied in *Merchants Home Delivery* and *Everson* because the practice at issue in this action is the business of insurance and is not an " 'anillary activit[y]' that do[es] not affect performance of the insurance contract or enforcement of contractual obligations." *Fabe,* — U.S. at ——, 113 S.Ct. at 2209 (quoting *Pireno,* 458 U.S. at 134 n. 8, 102 S.Ct. at 3011 n. 8).

"broad category of laws enacted 'for the purpose of regulating the business of insurance' ... necessarily encompasses more than just the 'business of insurance.'" *Fabe*, —— U.S. at ——, 113 S.Ct. at 2210.

When courts have applied the term "business of insurance" in the McCarran–Ferguson Act as the basis for defining the scope of ERISA's Savings Clause, they have used the three part test for the business of insurance that was articulated in *Pireno* and *Royal Drug*. *See Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 48–49, 107 S.Ct. 1549, 1553–54, 95 L.Ed.2d 39 (1987); *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 743, 105 S.Ct. 2380, 2391, 85 L.Ed.2d 728 (1985). However, the three part test developed in *Pireno* and *Royal Drug*, and consequently applied to ERISA's Savings Clause in *Metropolitan Life* and *Pilot Life*, "involved the scope of the antitrust immunity located in the *second* clause of § 2(b)." *Fabe*, —— U.S. at ——, 113 S.Ct. at 2209. Simply put, the *Pireno* test defines only the "business of insurance," which, by definition, is not as broad as the scope of the language at issue here ("laws enacted by any State for the purpose of regulating the business of insurance.") Therefore, the Fourth Circuit's decisions in *Tri–State* and *Pireno* to the effect that the West Virginia Unfair Trade Practice Act does not constitute the "business of insurance" do not require a decision in this action that the sections of Virginia's Unfair Trade Practices Act at issue here were not "enacted ... for the purpose of regulating the business of insurance."

At first glance, it may seem peculiar that the phrase "regulates insurance," as used in ERISA's Savings Clause is different in scope from the phrase "enacted ... for the purpose of regulating the business of insurance," as used in the first clause of Section 2(b) of the McCarran–Ferguson Act. For several reasons, however, the distinction is both logical and necessary. First, the first clause of Section 2(b) contains the word "purpose" which is missing from ERISA's Savings Clause. As the Supreme Court held in *Fabe*, inclusion of this word effectuates a broader scope than where that word is omitted and the reference is only to the "business of

insurance" itself. *Fabe*, —— U.S. at ——, 113 S.Ct. at 2210.

Second, the distinction is entirely consistent with the purpose of the McCarran–Ferguson Act through which Congress intended to remove "obstructions which might be thought to flow from [Congress'] own power, whether dormant or exercised, *except as otherwise expressly provided in the Act itself or in future legislation.*" *Fabe* —— U.S. at ——, 113 S.Ct. at 2207 (quoting *Prudential Ins. Co. v. Benjamin*, 328 U.S. 408, 429–30, 66 S.Ct. 1142, 1154–55, 90 L.Ed. 1342 (1946)) (emphasis added). The first clause of Section 2(b), therefore, imposes "what is, in effect, a clear-statement rule, a rule that state laws enacted 'for the purpose of regulating the business of insurance' do not yield to conflicting federal statutes unless a federal statute specifically requires otherwise." *Fabe*, —— U.S. at ——, 113 S.Ct. at 2211. Accordingly, under the first clause of Section 2(b) states have the broadest power to regulate the business of insurance where neither the McCarran–Ferguson Act nor another federal statute specifically provides that its power should be less extensive.

The *Pireno* test for the "business of insurance" developed in the context of the antitrust exemption contained in the second clause of Section 2(b). There Congress intended to carve out an exemption from federal antitrust law that was more "narrow" than the exemption described in the first clause of Section 2(b). *Fabe*, —— U.S. at ——, 113 S.Ct. at 2210. Congress therefore used language less broad then it used in the first clause.

For the reasons set forth above, the court concludes that those provisions of Chapter 5 of Title 38.2 that are at issue in this case are laws "enacted ... for the purpose of regulating the business of insurance," and that the Fourth Circuit's decisions in *Tri–State* and *Custer* do not require a different result.

### 3. Whether the State Law Would be Superseded, Impaired or Invalidated by the Application of RICO

Even if a state law was enacted for the purpose of regulating the business of insurance and the federal law at issue does not specifically relate to the business of insur-

ance, the McCarran–Ferguson Act will operate to bar application of the federal law only where its application would "invalidate, impair, or supersede" the state law.

The provisions of Chapter 5 of Title 38.2 that apply to the defendants' conduct in this case, and that this court has already held were "enacted ... for the purpose of regulating the business of insurance," are directed to the prohibition, remediation and punishment of acts such as those on which the plaintiffs fasten their RICO claim. These provisions can be enforced only by the SCC because Chapter 5 does not create a private cause of action.[8] The issue is whether application of RICO would "invalidate, impair or supersede" Chapter 5 of Title 38.2. The words "invalidate, impair and supersede" are not defined in the McCarran–Ferguson Act. Like all statutory terms, those three words must be given their ordinary meaning unless another meaning is dictated by the context in which they are used or by statutory definition. *See Asgrow Seed Co. v. Winterboer,* — U.S. ——, ——, 115 S.Ct. 788, 793, 130 L.Ed.2d 682 (1995); *Federal Deposit Ins. Corp. v. Meyer,* — U.S. ——, ——, 114 S.Ct. 996, 1001, 127 L.Ed.2d 308 (1994); *Watt v. Alaska,* 451 U.S. 259, 265–66, 101 S.Ct. 1673, 1677–78, 68 L.Ed.2d 80 (1981).

"Invalidate" means to "weaken or make valueless" or to discredit. It is a synonym for nullify. Webster's Third New International Dictionary 1188 (1986). "Impair" means to "make worse ... diminish in quantity, value, excellence or strength ... do harm to." *Id.* at 1131. "Supersede" means to "make obsolete, inferior, or outmoded ... to make void ... to make superfluous or unnecessary." *Id.* at 2295.

RICO, which authorizes private causes of action, treble damages and attorneys fees is a powerful weapon in the arsenal of any litigant. Application of RICO to afford redress for violations of Chapter 5, would invalidate and impair the regulation sought to be accomplished by Chapter 5 and the enforcement mechanisms of Va.Code §§ 38.2–218–220. Most aggrieved insureds would opt for the prospect of treble damages rather than participate in remedial measures structured by the SCC. This would make insurers less willing to agree with the SCC to settle disputes over alleged violations for fear of compromising their positions in pending or threatened RICO litigation. The ability to act promptly and to secure for insureds settlements is central to the state's ability to protect insureds and to regulate the insured-insurer relationship. The prospect of treble damages and attorneys fees would weaken, diminish and do serious injury to, if not nullify, the sections of Chapter 5, and the enforcement mechanisms which protect and regulate that relationship.

Application of RICO would also supersede the state laws at issue. Because RICO provides for a private cause of action and treble damages, and because these provisions of RICO differ dramatically from the way in which Virginia's insurance code addresses the same conduct, RICO would in effect replace Chapter 5 as the principal means by which to remedy such conduct. It would convert a system of public redress into a system of private redress. The forum for redress would shift from the SCC to the federal courts. The result of these effects would be that RICO would supersede Virginia's laws.

Driven by concerns such as these, several district courts confronted with similar facts have held that application of civil RICO "invalidate[s], impair[s], or supersede[s]" state laws "enacted ... for the purpose of regulating the business of insurance" when the state laws did not provide for private causes of action, treble damages, costs, or attorneys

---

8. The SCC has acted under these, and other, provisions of the state insurance law to stop the discounting practices, to impose a $5 million civil penalty and to secure the insurers' agreement to a consent order by which they are required to implement, under the supervision of the SCC, a comprehensive refund program which has produced more than 128,000 refunds amounting to a total payment of $21.9 million.

Those punitive and corrective measures were the product of a comprehensive investigation which considered the offending practices, the interests of the insurers, the need for remedial action, the need for punishment and the public interest. With those factors in mind, the SCC effectuated the remedial program and imposed the punishment it thought best satisfied all interests.

fees, all of which are available under RICO. *See Wexco Inc. v. IMC, Inc.,* 820 F.Supp. 194, 202–04 (M.D.Pa.1993); *Everson v. Blue Cross & Blue Shield of Ohio,* No. 93cv7534, 1994 WL 675200, at *12 (N.D.Ohio June 15, 1994); *LeDuc v. Kentucky Central Life Ins. Co.,* 814 F.Supp. 820, 829 (N.D.Cal.1992); *Forsyth v. Humana,* 827 F.Supp. 1498, 1521–22 (D.Nev.1993).

However, several recent decisions by courts of appeals outside of the Fourth Circuit have held that federal statutes do not "invalidate, impair or supersede" state statutes by permitting private causes of action not available under the state law or by allowing remedies not available under the state law. *See Nationwide Mut. Insurance Co. v. Cisneros,* 52 F.3d 1351, 1363 (6th Cir.1995); *Merchants Home Delivery Service, Inc. v. Frank B. Hall & Co., Inc.,* 50 F.3d 1486, 1491–92 (9th Cir.1995); *National Association for the Advancement of Colored People v. American Family Mut. Ins. Co.,* 978 F.2d 287, 295–97 (7th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2335, 124 L.Ed.2d 247 (1993).[9] Of these decisions, only *Merchants Home Delivery* involved application of the RICO statute.

In *Merchants Home Delivery,* the Ninth Circuit held that "the application of a federal statute prohibiting acts which are also prohibited under a state's insurance laws does not 'invalidate, impair or supersede' the state's laws under § 2(b) of the McCarran–Ferguson Act." *Merchants Home Delivery,* 50 F.3d at 1492. Significantly, however, the Ninth Circuit framed the issue as whether "the term 'impair' is intended to be a very broad proscription against applying federal law where a state has regulated, or chosen not to regulate, in the insurance industry." *Id.* at 1491 (emphasis omitted). The court held that "[t]he language of § 2(b) is inconsistent with a congressional intent to allow states to preempt the field of insurance regulation." *Id.* at 1492. The defendants in this case do not make the argument that the Ninth Circuit considered and rejected. Rather, they argue that the specific federal

statute at issue in this case, civil RICO, would have the effect of impairing and superseding specific state laws regulating the business of insurance. To that extent, *Merchants Home Delivery* is distinguishable.

The decisions of the Sixth and Seventh Circuits in *Nationwide* and *American Family,* respectively, also reached the broad holding that federal civil rights laws that prohibit the same conduct as state insurance laws cannot be said to "invalidate, impair or supersede" the state laws, even if they differ in the remedies and enforcement mechanisms that they make available. *Nationwide,* 52 F.3d at 1363; *American Family,* 978 F.2d at 295–97. However, those decisions did not consider the application of RICO. They involved the application of the federal Fair Housing Act, 42 U.S.C. §§ 3601–19. Because the remedies available under RICO are among the most severe ever enacted in a federal civil statute, and because RICO is uniquely applicable to a broad range of activities, these decisions addressing a wholly different federal law are not controlling here.

To the extent that the decisions of the Sixth, Seventh and Ninth Circuits must be read to hold that any federal statute which proscribes the same conduct as a state statute will never "invalidate, impair or supersede" the state statute, those holdings would be both overly broad and inconsistent with the plain meaning of the language of Section 2(b). First, the inquiry that the McCarran–Ferguson Act requires, whether federal law "invalidate[s], impair[s], or supersede[s]" state law, does not lend itself to a blanket rule that certain types of inconsistencies can never satisfy that language. Rather, the language of Section 2(b) requires that a court look at the actual effect of the federal law on the specific state law. In this case, the court is persuaded that allowing claims under RICO will greatly impair the SCC's ability to enforce Virginia's insurance code and, specifically, to secure from insurers settlements that are in the interest of all insureds and in the public interest as well. The court also finds the disparity between the cause of ac-

9. The court also recognizes that some of the district courts whose decisions are cited above might be required to reach different results in light of the decisions issued by their respective courts of appeals.

tion and remedy permitted by RICO and the enforcement mechanism and remedy permitted by Virginia's insurance code to be so great that the federal law would in fact supersede the state law. To ignore these conclusions in favor of a bright line rule that no federal law can "invalidate, impair, or supersede" a state law so long as they prohibit the same acts is contrary to the purposes of the McCarran–Ferguson Act as well as to its plain language.

Second, the premise that federal and state laws that prohibit the same conduct "but differ in penalty do not conflict with or displace each other," *American Family*, 978 F.2d at 297, seems to be based on a very narrow reading of the purpose and function of the state laws at issue. Virtually any state statute includes more than a simple proscription of conduct. It includes the appropriate penalty for that conduct and the appropriate mechanism for enforcing the proscription. A state law that prohibits an act, punishes it with a specific range of fines, makes it the subject of remedial action, and vests enforcement in a state quasi-judicial entity cannot be said to be consistent with a federal law that prohibits the same act, permits treble damages, fees, and costs, and expressly creates a personal cause of action. If *Nationwide, Merchants Home Delivery* and *American Family* are construed to hold otherwise, their lead cannot be followed here.

Moreover, all three decisions proceed upon a common, but flawed, analytical model by assessing the "invalidate, impair or supersede" facet of the McCarran–Ferguson analysis as an issue of "inverse preemption." *Nationwide*, 52 F.3d at 1363; *Merchants Home Delivery*, 50 F.3d at 1492; *American Family*, 978 F.2d at 296. As a result, all three decisions assess the effect of Section 2(b) of the McCarran–Ferguson Act through the prism of jurisprudence developed to determine when, under the Supremacy Clause, a federal statute preempts state law. This accounts for the fact that *American Family, Nationwide* and *Merchants Home Delivery* interpreted the McCarran–Ferguson Act to require a showing of direct conflict between the state and federal law to preclude application of the state law and then augmented

that determination by concluding that state and federal law could co-exist even though the federal law provided a cause of action not provided under state law and remedies greater than those provided by state law. *Nationwide*, 52 F.3d at 1363, *Merchants Home Delivery*, 50 F.3d at 1492; *American Family*, 978 F.2d at 295–97.

Preemption is the doctrine by which courts enforce Article VI of the Constitution which provides that the laws of the United States "shall be the supreme Law of the Land ... any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." U.S. Const. art. VI. Preemption occurs when Congress explicitly so provides or when the intent to preempt is implied by the structure and purpose of a federal statute. *Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 97 S.Ct. 1305, 1305, 51 L.Ed.2d 604 (1977). More particularly:

> In the absence of an express congressional command, state law is pre-empted if that law actually conflicts with federal law [citations omitted] or if federal law so thoroughly occupies a legislative field " 'as to make reasonable the inference that Congress left no room for the States to supplement it.' " [citations omitted].

*Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516, 112 S.Ct. 2608, 2617, 120 L.Ed.2d 407 (1992). Thus, the concept of preemption (whether "direct" or "inverse") requires a determination whether there exists a direct conflict between federal and state law or whether state and federal law can co-exist.

The McCarran–Ferguson Act does not admit of such an analysis even though in it Congress declared the primacy of state law in the regulation of the business of insurance. This is because the McCarran–Ferguson Act does not turn on status, *i.e.*, supremacy of a body of law, but on the effect of the law, *i.e.*, whether an act of Congress "invalidates, impairs or supersedes" certain kinds of state law.

Forcing the McCarran–Ferguson Act analysis into the preemption model distorts the analysis required by the statutory test fixed by the McCarran–Ferguson Act. Although direct conflict and co-existence—as used in the jurisprudence of federal preemption—no

doubt have a bearing on whether a federal law invalidates, impairs or supersedes a state law, the analytical model required by pre-emption does not always provide a proper basis for applying the McCarran–Ferguson standard. As explained above, that certainly is the case here. For this additional reason then, the court concludes that *Nationwide, Merchants Home Delivery* and *American Family* cannot control the McCarran–Ferguson analysis here.

Finally, two of those decisions find support in *Mackey v. Nationwide Ins. Cos.*, 724 F.2d 419 (4th Cir.1984) where the Fourth Circuit held that "[t]he presence of a general regulatory scheme does not show that any particular state law would be invalidated, impaired or superseded by the application of the Fair Housing Act or the Civil Rights Acts." *Id.* at 421. Some decisions have cited to *Mackey* as support for the proposition that the availability of a private cause of action and additional remedies under federal law does not make that law inconsistent with state law. *See Nationwide*, 52 F.3d at 1363; *American Family*, 978 F.2d at 296.

The Fourth Circuit's decision in *Mackey* did not go so far as the Sixth and Seventh Circuits suggest. What the Fourth Circuit held was that the existence of a comprehensive regulatory scheme was not, in and of itself, sufficient to show that application of a federal law would "invalidate, impair or supersede" any particular state law. The Fourth Circuit did not hold that only a direct conflict between the prohibitions of federal and state law would trigger the McCarran–Ferguson Act. In fact, the McCarran–Ferguson Act argument failed because "[w]e are not pointed to any law enacted by North Carolina *which would be 'impaired'* by application of the Fair Housing Act or the Civil Rights Acts." *Mackey*, 724 F.2d at 421 (emphasis added). The Fourth Circuit therefore concluded that "[i]n these circumstances, barring these claims is unnecessary to the effectuation of the congressional goals in enacting McCarran–Ferguson, insuring that states retain the power to regulate the business of insurance." *Id.*

In this action, the record demonstrates how application of RICO would impair and supersede the SCC's ability to enforce several specific provisions of Virginia's insurance code. The fact that the same conduct which the state attempted to prohibit would be the basis of a RICO claim does not insure "that states retain the power to regulate the business of insurance." *Id.* Therefore, the court concludes that the decision in *Mackey* does alter the determination that application of RICO would impair and supersede state laws "enacted ... for the purpose of regulating the business of insurance."

## CONCLUSION

For the foregoing reasons, the plaintiffs' RICO claims are precluded as a matter of federal law and the defendants' motion to dismiss under Fed.R.Civ.P. 12(b)(6) will be granted. With the dismissal of the RICO claim and the previous dismissal of the ERISA claims (Counts One and Two), this court lacks original jurisdiction over the remaining claims and, under 28 U.S.C. § 1367(c)(3), the court declines to exercise jurisdiction over the state law claims. Accordingly, Count Three is dismissed with prejudice and Count Four is dismissed without prejudice. Count Five, to the extent that it seeks relief flowing from Count Three, is dismissed with prejudice. To the extent that Count Five seeks relief on the basis of the state law claims, Count Five is dismissed without prejudice.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

It is so ORDERED.