———————

No. 96-1763

———————

John Doe; John Roe, on behalf        *
of themselves and all others         *
similarly situated,                  *
                                     *
         Appellants,                 *
                                     *  Appeal from the United States
    v.                               *  District Court for the
                                     *  District of Minnesota.
Norwest Bank Minnesota, N.A.,        *
a national banking association;      *
Voyager Guaranty Insurance           *
Company,                             *
                                     *
         Appellees.                  *


———————

         Submitted:  December 11, 1996

             Filed   February 28, 1997
———————

Before BOWMAN and HEANEY, Circuit Judges, and SMITH,[1] District Judge.

———————

BOWMAN, Circuit Judge.

     John Doe and John Roe brought a class action against Norwest Bank
Minnesota, N.A. (Norwest) and Voyager Guaranty Insurance Company (Voyager),
alleging violations of the usury provisions of the National Bank Act, 12
U.S.C. § 85-86 (1994), the anti-tying provisions of the Bank Holding
Company Act Amendments of 1970, 12 U.S.C. § 1972 (1994), and the Racketeer
Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c) (1994).  Doe
settled his

———————————

     The Honorable Ortrie D. Smith, United States District Judge
for the Western District of Missouri, sitting by designation.

claims and was dismissed from the case. The District Court[2] granted judgment in favor of the defendants on the federal claims and declined to exercise supplemental jurisdiction over the plaintiffs' state-law claims. Roe appeals, and we affirm.

## I.

Before summarizing the facts, we consider the relevance of Doe's claim to this case. Although Doe settled his claim and was dismissed from the case, Roe argues that "Doe's suitability as a class representative remains in issue." Roe's Br. at 1 n.2. We disagree. This action was filed on November 3, 1994, and Doe agreed to settle on February 28, 1995. When Doe apparently had misgivings, the defendants moved the court to enforce the settlement agreement and dismiss Doe from the case. The District Court did so, dismissing Doe on September 11, 1995, and Doe has not appealed that order. Accordingly, Doe is no longer a party to this action, individually or in his capacity as a class representative.

Of course, the dismissal of Doe did not affect the claim of Roe or the claims of the unnamed class members in any way. This case remains a putative class action with Roe as representative. We will therefore summarize the facts of Roe's claim. In 1989, Roe purchased a pickup truck from a dealer and entered into an installment contract, granting the dealer a security interest in the pickup truck. The dealer assigned the contract to Norwest. Several provisions of the installment contract addressed insurance on the pickup truck:

---

The Honorable Michael J. Davis, United States District Judge for the District of Minnesota, adopting two reports and recommendations of The Honorable John M. Mason, United States Magistrate Judge for the District of Minnesota.

> Insurance on property I [Roe] give as security is required.  If insurance is required, I may buy it through any insurance agent or company of my choice. . . .
>
> . . .
>
> If you [Norwest] require property insurance, it must cover all risks of physical damage to the property and the risk that the vehicle may be lost. . . .  I promise to keep the property insured throughout the term of my loan and to deliver a certificate of insurance to you that shows I have purchased insurance of this kind.
>
> . . .
>
> I also agree that, if I fail to keep any required insurance on the property, you may purchase such insurance for me.  I will immediately repay you for any amounts you spend in purchasing that insurance, plus interest at the "annual percentage rate" disclosed on the other side of this contract.

Roe's App. at 135-36.  At the same time, Roe signed a document entitled "Agreement to Provide Accidental Physical Damage Insurance," which read:

> I understand that to provide protection from serious financial loss, should an accident or loss occur, Norwest . . . requires the collateral securing my loan to be continuously covered with insurance against the risks of fire, theft, and collision, and that **failure to provide such insurance gives Bank the right to declare the entire unpaid balance immediately due and payable or alternatively to purchase coverage for its interest and add the premium plus interest to the balance.** . . .
>
> I further understand and agree to maintain insurance, as described above, in force during the term of the loan and will furnish Norwest . . . with a loss payable endorsement upon each renewal of said insurance.

Norwest's App. at 69.

In February 1993, Norwest notified Roe that it had not received proof of insurance and warned him that if he failed to provide proof of insurance, Norwest could exercise its right to

-3-

purchase insurance. Norwest's letter notified Roe that if the bank purchased insurance, the premium of $902 (for a year of coverage) would be added to his loan balance. When Roe did not provide proof of insurance, Norwest purchased insurance from Voyager and added $902 to Roe's balance. Voyager then sent Roe a certificate of coverage, which indicated that only Norwest's interest in the vehicle was insured.

When that coverage expired in January 1994, Norwest again warned Roe that it had not received proof of insurance. The same process was repeated, and Norwest purchased insurance and added the premium of $549 to Roe's loan balance. In June 1994, Roe apparently proved to Norwest that he had procured his own insurance, and Norwest credited his loan with $233, the unearned portion of the $549 premium. At about the same time, Norwest added to Roe's loan a charge of $11.60 for interest on the insurance charge.

As part of its collateral protection insurance program, Norwest has an umbrella insurance policy with Voyager, pursuant to which Norwest purchases insurance when borrowers fail to provide their own insurance. When Norwest purchases insurance from Voyager with respect to a particular piece of collateral, the insurance covers only Norwest's interest in the collateral. The coverage, which is otherwise similar to ordinary comprehensive and collision coverage, is limited to either the damage to the collateral or the balance of the customer's loan, whichever is smaller in amount. The umbrella policy also contains two endorsements that are significant in this case. The first endorsement, entitled "Waiver of Repossession Requirement," waives the requirement that Norwest repossess the borrower's vehicle before making a claim. The second, the "Waiver of Salvage Deduction on Non-Repossession Claims," modifies the policy so that the amount payable to Norwest on a claim is not reduced by the salvage value of the borrower's

vehicle.[3]  Roe's arguments that insurance charges attributable to these endorsements were unauthorized form the basis of this action.

The plaintiffs brought this action in federal district court, asserting claims under the National Bank Act and the Bank Holding Company Act against Norwest only and a RICO claim against Voyager only.  After permitting discovery and dismissing Doe from the case, the District Court granted summary judgment to the defendants on the National Bank Act claim and dismissed the anti-tying and RICO allegations for failure to state a claim on which relief could be granted.  See Doe v. Norwest Bank Minn., N.A., 909 F. Supp. 668 (D. Minn. 1995) (order dismissing RICO count).  The court dismissed these federal claims with prejudice and declined to exercise supplemental jurisdiction over the state-law claims, dismissing them without prejudice.  Roe's appeal challenges the dismissal of the federal claims.

**II.**

We address the National Bank Act claim first.  Insofar as it is relevant here, the National Bank Act permits a national bank to charge "interest at the rate allowed by the laws of the State . . . where the bank is located . . . and no more."  12 U.S.C. § 85 (1994).  Section 86 provides a federal cause of action for usury against a national bank that "tak[es], receiv[es], reserv[es], or charg[es] a rate of interest greater than is allowed by section 85 of this title."  12 U.S.C. § 86 (1994); see also M. Nahas & Co. v. First Nat'l Bank, 930 F.2d 608, 612 (8th Cir. 1991) (remedy of § 86

_____

Prior to January 1991, Norwest had a different policy with Voyager that contained additional endorsements.  This policy is not relevant here.  Roe also claims that Norwest imposed an additional charge for calculating his premium based on the outstanding principal balance rather than the sum of principal and interest.  However, Norwest introduced undisputed evidence that no such charge was made to Roe's account because the charge applies only to simple-interest accounts, which Roe's was not.

-5-

completely preempts state-law usury actions against national banks); <u>Fisher v. First Nat'l Bank</u>, 548 F.2d 255, 257 (8th Cir. 1977) (interest rate a national bank may charge is ultimately a question of federal law).

Roe argues that the "unauthorized" charges attributable to the repossession and salvage waivers, and perhaps the full amount of insurance charges, should be considered interest with respect to his installment loan.  Norwest argues that charges for insurance are not interest at all, but even if they were considered interest, the total interest rate on Roe's loan would be below the allowable cap under Minnesota law.  The parties' experts assumed that all the charges were interest but used different interpretations of the Federal Reserve's Regulation Z (12 C.F.R. pt. 226 (1996)) to support their conclusions:  Roe's expert calculated the interest rate by amortizing the insurance charges over the period of time from when they were imposed to the end of the loan term, while Norwest's expert amortized the insurance charges, like the ordinary interest charges, over the entire length of the loan.  The District Court assumed that all the insurance charges were interest and approved the calculation method of Norwest's expert.  Because that method resulted in an interest rate below the maximum allowed by Minnesota law, the court granted summary judgment to Norwest.

We review a grant of summary judgment de novo, affirming only if the record, viewed in the light most favorable to the nonmoving party, shows no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  <u>See</u> <u>Smith v. City of Des Moines</u>, 99 F.3d 1466, 1468-69 (8th Cir. 1996).  We may affirm on any ground supported by the record.  <u>See</u> <u>Phillips v. Marist Soc'y</u>, 80 F.3d 274, 275 (8th Cir. 1996).

We need not resolve the parties' thorny dispute about the correct interpretation of Regulation Z, nor need we decide the less-complicated question of the applicable interest-rate cap under

Minnesota law.  Instead, we conclude that collateral protection insurance premiums charged to a borrower's account do not, as a matter of federal law, constitute "interest" within the meaning of § 85.[4]

The Office of the Comptroller of the Currency recently issued an interpretive ruling regarding the meaning of the term "interest" in § 85. That ruling reads:

> The term "interest" as used in 12 U.S.C. 85 includes any payment compensating a creditor or prospective creditor for an extension of credit, making available of a line of credit, or any default or breach by a borrower of a condition upon which credit was extended.  It includes, among other things, the following fees connected with credit extension or availability: numerical periodic rates, late fees, not sufficient funds (NSF) fees, overlimit fees, annual fees, cash advance fees, and membership fees.  It does not ordinarily include appraisal fees, _premiums and commissions attributable to insurance guaranteeing repayment of any extension of credit_, finders' fees, fees for document preparation or notarization, or fees incurred to obtain credit reports.

Interpretive Rulings, 61 Fed. Reg. 4849, 4869 (1996) (to be codified at 12 C.F.R § 7.4001(a)) (emphasis added).  Although this ruling is a recent one, it has already received the imprimatur of the Supreme Court.  In _Smiley v. Citibank (S.D.), N.A._, 116 S. Ct. 1730 (1996), the Court unanimously held that the word "interest" in § 85 was ambiguous and that the Comptroller's judgment as to its meaning was entitled to deference under _Chevron U.S.A. Inc. v. National Resources Defense Council, Inc._, 467 U.S. 837 (1984).  _See Smiley_, 116 S. Ct. at 1732-33.  The Court then concluded that the Comptroller's inclusion of late fees within the meaning of

---

Roe argues that Norwest has raised this issue for the first time on appeal.  This assertion is patently untrue. _See_ Report and Recommendation of Dec. 21, 1995, at 4 ("Defendant makes a compelling argument that [the charges] are not interest for any purpose.").

"interest" was a reasonable interpretation of the statute. See id. at 1735. Because the law of South Dakota, Citibank's home state, permitted banks to charge late fees, the determination that late fees are interest for National Bank Act purposes put an end to the state-law claims of Smiley, a California resident. See id. at 1732; Marquette Nat'l Bank v. First of Omaha Serv. Corp., 439 U.S. 299, 313 (1978) (national bank may charge interest allowed by its home state even if such interest would not be allowed to bank in borrower's home state).

In the instant case, we are faced with a slightly different issue. If we accept the Comptroller's judgment that "premiums and commissions attributable to insurance guaranteeing repayment of any extension of credit" are not "interest," and we conclude that the charges involved here are premiums within that definition, Roe's claim must fail because he cannot show that Norwest charged "a rate of interest greater than is allowed by section 85." 12 U.S.C. § 86 (1994) (emphasis added).

We have little difficulty concluding that the Comptroller's interpretation of "interest" as excluding insurance premiums is reasonable. The Supreme Court has already determined that "interest," as it is used in § 85, is not an unambiguous term. See Smiley, 116 S. Ct. at 1732-33. Our inquiry, therefore, is whether "the agency's answer is based on a permissible construction of the statute." Chevron, 467 U.S. at 843. Certainly the ordinary definition of "interest" does not include insurance premiums passed along from creditor to debtor. See Black's Law Dictionary 812 (6th ed. 1990) ("Interest is the compensation allowed by law or fixed by the parties for the use or forbearance of borrowed money."); Smiley, 116 S. Ct. at 1735 (interest is "`compensation which is paid by the borrower to the lender or by the debtor to the creditor for . . . use [of money]'") (quoting 1 J. Bouvier, A Law Dictionary 652 (6th ed. 1856)) (alterations in Smiley). Indeed, we believe it is quite sensible to conclude that such premiums are not interest

but rather additions to the principal of the loan, or perhaps separate extensions of credit entirely.  See Kenty v. Bank One, Columbus, N.A., 92 F.3d 384, 393 (6th Cir. 1996).  And, as the Court stated in Smiley, it is "quite possible and rational to distinguish, as the regulation does," between charges that are specifically assigned to the expenses of the bank in undertaking such activities as processing an application, insuring a loan, or appraising collateral and, on the other hand, charges "that are assessed for simply making the loan, or for the borrower's default."  Smiley, 116 S. Ct. at 1734.  We conclude that the Comptroller's ruling excluding "premiums and commissions attributable to insurance guaranteeing repayment of any extension of credit" from the definition of "interest" is reasonable.

The question remains whether the charges involved here fit within the Comptroller's definition.  Although collateral protection insurance has produced a substantial body of case law in recent years, we have been unable to locate any cases addressing the precise issue presented here in light of Smiley.  Cf. Giddens v. Hometown Fin. Servs., 938 F. Supp. 801, 806-07 (M.D. Ala. 1996) (suggesting that insurance premiums are not interest; holding that case was improperly removed); Kenney v. Farmers Nat'l Bank, 938 F. Supp. 789, 793-94 (M.D. Ala. 1996) (same).  But cf. Moss v. Southtrust Mobile Servs., Inc., No. CV-95-P-1647-W (N.D. Ala. Sept. 22, 1995) (holding, without discussion of Comptroller's ruling, that unauthorized premiums are interest and finding state-law claims completely preempted).[5]

_____

The opinions in the Kenty case express different views of the collateral protection insurance in that case.  On a motion to dismiss, the district court held that insurance charges that were "unauthorized and unnecessary to protect the collateral" could be considered interest on the loan.  See Kenty v. Bank One, Columbus, N.A., 1992 WL 170605, at *4 (S.D. Ohio Apr. 23, 1992).  At the summary judgment stage, however, the court concluded that state law imposed no maximum on the allowable interest rate, so that it did not matter whether any portion of the insurance charges was considered interest.  See Kenty v. Bank One, Columbus, N.A., 1993 WL 592532, at *5 (S.D. Ohio Oct. 25, 1993).  The Sixth Circuit saw Kenty's argument slightly differently, believing Kenty was complaining about the bank's charging interest on the insurance charges.  That court concluded that the insurance premiums were

Roe argues that the charges added to his account are in fact not premiums attributable to insurance, but rather charges "compensating a creditor or prospective creditor for . . . [a] default or breach by a borrower," which would fit them within the Comptroller's definition of "interest." See 61 Fed. Reg. at 4869. It is true that Norwest charges a borrower for insurance only after the borrower breaches the covenant to maintain insurance. But there is a notable difference between a late fee, which compensates the creditor solely for the effects of the debtor's default, and an insurance charge, which compensates the creditor for the cost of protecting its security, a cost the debtor is supposed to bear anyway. In addition, the limitation of the coverage in this case to the lesser of the damage to the collateral or the loan balance indicates that the insurance is designed to guarantee the repayment of the loan. Accordingly, we believe that these collateral protection insurance premiums are excluded by the Comptroller's interpretive ruling from the general category of charges compensating a creditor for a default or breach and placed in the category of premiums attributable to insurance guaranteeing the repayment of credit extended.

Roe also argues that even if the basic insurance coverage is not interest, the allegedly unauthorized aspects of the insurance must be considered interest. We disagree. The charges related to the waiver of repossession and waiver of salvage endorsements are not trivial; Roe's expert calculated that these endorsements accounted for more than thirty percent of the total premium charged to Roe. But Norwest introduced undisputed evidence that these endorsements placed Norwest in exactly the same position in which

themselves loans, and so state law permitted the bank to charge any amount of interest on the premiums. See 92 F.3d at 393. None of these opinions addresses the Comptroller's interpretation of § 85.

-10-

it would have been if Roe had purchased a standard Minnesota automobile insurance policy and named Norwest as loss payee, as the loan agreement required him to do.  In other words, under an ordinary policy in Minnesota, a lender named as loss payee would not have to repossess a wrecked car in order to make a claim, and the amount received by the lender would not be reduced by the salvage value of the car.  We therefore see no reason to treat the charges related to the waiver endorsements any differently from the basic insurance charge.  Although they may be differentiated for insurance purposes, they are in essence a single package designed to replicate the coverage Roe should have provided himself.[6]

In sum, unlike late fees, NSF fees, and the like, the insurance charges in this case benefitted both creditor and borrower by making it easier for Roe to repay the loan in case his truck were physically damaged or stolen.  (Roe, after all, would remain liable on the note even if the collateral were valueless.)  Norwest merely passed along to Roe the exact cost Norwest incurred in procuring insurance that restored it to the same situation in which it would have been had Roe kept his end of the bargain.  The charges therefore are "premiums . . . attributable to insurance guaranteeing repayment of [an] extension of credit," and under the Comptroller's reasonable interpretation of the statute, they are not "interest."  We conclude that the events that form the basis of this cause of action do not amount to a violation of the National Bank Act.

_____

At times in his brief and at oral argument, counsel for Roe seemed to be challenging a third endorsement, entitled "Automatic Coverage," which covers collateral retroactively to the date on which the borrower's own insurance lapsed.  We see no reason to treat this endorsement any differently from the others, as it also merely replicates the coverage Roe was contractually obligated to provide.

**III.**

The District Court dismissed Roe's anti-tying allegations for failure to state a claim on which relief could be granted.  See Fed. R. Civ. P. 12(b)(6).  In considering a motion to dismiss, we assume all facts alleged in the complaint are true, construe the complaint liberally in the light most favorable to the plaintiff, and affirm the dismissal only if "it appears beyond a doubt that the plaintiff can prove no set of facts which would entitle the plaintiff to relief."  Coleman v. Watt, 40 F.3d 255, 258 (8th Cir. 1994).  Our review is de novo.  See id.

The relevant provisions of the Bank Holding Company Act Amendments of 1970 state as follows:

> (1) A bank shall not in any manner extend credit, lease or sell property of any kind, or furnish any service . . . on the condition or requirement--
>
> > (A) that the customer shall obtain some additional credit, property, or service from such bank other than a loan, discount, deposit, or trust service;
> >
> > . . .
> >
> > (C) that the customer provide some additional credit, property, or service to such bank, other than those related to and usually provided in connection with a loan, discount, deposit, or trust service.

12 U.S.C. § 1972(1) (1994).  The plaintiff in an action under this section must show that the bank imposed a tie, that the practice was unusual in the banking industry, that it resulted in an anti-competitive arrangement, and that it benefitted the bank.  See Alpine Elec. Co. v. Union Bank, 979 F.2d 133, 135 (8th Cir. 1992).

Roe alleged two potential ties in his complaint:  when he purchased insurance through the bank, he was required to accept an

-12-

automatic extension of credit to pay for the insurance; and when he purchased property damage insurance through the bank, he was also required to purchase additional insurance that was unauthorized and undisclosed. On appeal, Roe emphasizes that he does not suggest that the purchase of insurance through the bank was a condition of the extension of credit for the original loan. See Kenty, 92 F.3d at 395 (where borrower is free to purchase insurance on open market, insurance is not tied to original loan).

Roe first complains that when he elected to purchase insurance through the bank rather than from an independent agent--a highly debatable characterization of the facts, but one we will entertain for purposes of this motion to dismiss--he found that the only way he was permitted to pay for the insurance was to have it added to his loan balance, where it bore interest at the loan rate. But this contention is belied by the language of the installment agreement itself, which was attached to Roe's complaint and forms a part of the pleadings: "I MAY PREPAY MY OBLIGATIONS UNDER THIS AGREEMENT, IN WHOLE OR IN PART, AT ANY TIME WITHOUT PENALTY." Roe's App. at 135. It is therefore clear that Roe was not required to accept an automatic extension of credit to pay for the insurance; he could have tendered payment to Norwest in the amount of the insurance premium (or in any other amount) at any time. Because Roe's complaint itself demonstrates that this supposed tie did not exist, this allegation does not state a claim on which relief could be granted.

The second alleged tie presents a more substantial question. Roe here argues that when he elected to purchase property damage coverage through Norwest, he was also required to purchase other unauthorized and undisclosed coverages. Norwest suggests that we adopt the reasoning of the Sixth Circuit, which held on nearly identical allegations in Kenty that because the borrower never agreed to purchase the unauthorized insurance, that purchase could not have been a "condition or requirement" of the purchase of the

authorized insurance, as § 1972(1) requires.  See <u>Kenty</u>, 92 F.3d at 395.
In effect, that court held that "a valid breach of contract claim cannot
be converted into an anti-tying claim."  <u>Id.</u>  We are not sure that we agree
with the reasoning of the Sixth Circuit, particularly in the context of a
motion to dismiss.  Fairly read, Roe's complaint alleges that Norwest
provides property damage insurance only if borrowers also pay for other,
unauthorized insurance coverage.  It therefore appears that the purchase
of the unauthorized coverage is a "requirement" of the purchase of property
damage coverage, for the latter is not available without the former.  We
do not believe that the fact that the unauthorized coverage is undisclosed
should affect this portion of the analysis.  Roe's complaint thus alleges
a tie and satisfies the first requirement of an anti-tying claim.

We reach the same result as the Sixth Circuit by another route,
however, for we believe Roe's complaint does not allege an anti-competitive
tie.  Unlike a Sherman Act plaintiff, a plaintiff in a § 1972 action need
not show that a tie has anti-competitive effects.  <u>See</u>, <u>e.g.</u>, <u>Palermo v.
First Nat'l Bank & Trust Co.</u>, 894 F.2d 363, 368 (10th Cir. 1990); <u>Davis v.
First Nat'l Bank</u>, 868 F.2d 206, 208 (7th Cir.), <u>cert. denied</u>, 493 U.S. 816
(1989); <u>Parsons Steel, Inc. v. First Ala. Bank</u>, 679 F.2d 242, 245 (11th
Cir. 1982); <u>cf.</u> <u>Jefferson Parish Hosp. Dist. No. 2 v. Hyde</u>, 466 U.S. 2, 13-
16 (1984) (Sherman Act tying plaintiff must show that defendant has market
power in tying market and that tie forecloses substantial volume of
commerce).  But a § 1972 plaintiff is required to show an anti-competitive
<u>practice</u>, that is, "that the practice results in unfair competition or
<u>could lessen competition</u>."  <u>Palermo</u>, 894 F.2d at 368 (emphasis added); <u>see
also</u> <u>Davis</u>, 868 F.2d at 208; <u>Parsons Steel</u>, 679 F.2d at 246.[7]

_____

We disagree with trial court decisions from within our Circuit
opining that a tie is a per se violation of § 1972.  <u>See</u> <u>JST
Properties v. First Nat'l Bank</u>, 701 F. Supp. 1443, 1449 (D. Minn.
1988); <u>Sharkey v. Security Bank & Trust Co.</u>, 651 F. Supp.
1231, 1232 (D. Minn. 1987).

-14-

In this case, Roe has not alleged an anti-competitive practice. In the market for property damage insurance (the tying market), it is undisputed that Roe was permitted to purchase from any vendor of his choice. Roe has alleged nothing from which a factfinder could conclude that the tie would have any anti-competitive disruption in the tying market. Nor can there be any anti-competitive result in the tied market, the market for the unauthorized insurance coverage, for the simple reason that Roe did not want to purchase such coverage from any vendor. See Jefferson Parish, 466 U.S. at 16 ("[W]hen a purchaser is `forced' to buy a product he would not have otherwise bought even from another seller in the tied-product market, there can be no adverse impact on competition because no portion of the market which would otherwise have been available to other sellers has been foreclosed."). When these circumstances are considered together--that is, Roe can buy basic property damage insurance anywhere and does not want to buy other coverage at all--it is clear that Norwest's practice cannot possibly lessen competition. It therefore cannot be considered an anti-competitive practice. See Palermo, 894 F.2d at 368. The District Court properly dismissed this allegation for failure to state a claim.

## IV.

Finally, we consider Roe's RICO allegations. The District Court concluded that Roe failed to state a claim on which relief could be granted because the application of RICO to the alleged actions of Voyager was barred by the McCarran-Ferguson Act, 15 U.S.C. § 1012(b) (1994). We agree.

The relevant portion of the McCarran-Ferguson Act provides that "No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of

regulating the business of insurance . . . unless such Act specifically relates to the business of insurance."  15 U.S.C. § 1012(b) (1994).  The McCarran-Ferguson Act bars the application of a federal statute if (1) the statute does not specifically relate to the business of insurance; (2) a state statute has been enacted for the purpose of regulating the business of insurance; and (3) the federal statute would invalidate, impair, or supersede the state statute.  See Murff v. Professional Med. Ins. Co., 97 F.3d 289, 291 (8th Cir. 1996) (citing United States Dep't of Treasury v. Fabe, 508 U.S. 491, 501 (1993)).[8]

The parties agree that RICO does not specifically relate to the business of insurance.  Nor does Roe seriously dispute Voyager's contention that Minnesota has enacted a comprehensive statutory scheme to regulate the business of insurance.  See Minn. Stat. ch. 59A-72C (1996).  The only substantial question for our review, therefore, is whether the application of RICO to the activities of Voyager would invalidate, impair, or supersede Minnesota's insurance laws.

Fairly summarized, Roe's complaint contains two substantive allegations.  First, Roe alleges that Voyager contracted to function as Norwest's automobile insurance department, sending notices to borrowers which appeared to be from Norwest and causing

---

Despite the apparent agreement of the parties to the contrary, the application of the McCarran-Ferguson Act in this case does not require a specific conclusion that the allegedly improper activities of Voyager constituted the "business of insurance." Fabe recognizes that the three-part test of Union Labor Life Ins. Co. v. Pireno, 458 U.S. 119, 129 (1982), for determining whether a particular practice constitutes the business of insurance is relevant only in cases involving a conflict between state law and federal antitrust law, a conflict which is the subject of a separate provision of the McCarran-Ferguson Act.  See Fabe, 508 U.S. at 504-05.

borrowers to be charged for unauthorized insurance coverage.[9] Second, Roe claims that Voyager paid or caused to be paid to Norwest "illegal and unauthorized kickbacks, rebates, and/or commissions" with respect to the borrowers' collateral insurance premiums.[10] Compl. ¶ 57. All of this alleged activity, Roe claims, constitutes a massive pattern of racketeering activity, particularly mail fraud and wire fraud, in violation of 18 U.S.C. § 1962(c) (1994).

Voyager argues that the allegedly fraudulent activities with which it is charged fall squarely within several sections of Minnesota's insurance laws. See Minn. Stat. §§ 72A.08(2) (1996) (prohibiting payment of rebate to insured), 72A.20(1) (1996) (prohibiting misrepresentation of terms of policy issued or to be issued), 72A.20(12)(1) (1996) (prohibiting misrepresentation of pertinent facts or policy provisions relating to coverages).

_____

Roe argues that our opinion in First Nat'l Bank v. Taylor, 907 F.2d 775 (8th Cir.), cert. denied, 498 U.S. 972 (1990), holds that the McCarran-Ferguson Act is inapplicable to a national bank, and that because he alleges that Voyager was acting as the agent of a national bank, the Act cannot apply here. We believe Roe misreads that case, which relies on the conclusion that the bank was specifically authorized by the National Bank Act to undertake the insurance-like activity that was the subject of the case. See Taylor, 907 F.2d at 778-79. In any event, Voyager is an insurance company and is subject to Minnesota's laws regulating insurance companies; that it may have been working on behalf of a bank adds nothing to this analysis.

Evidence in the record on appeal suggests that the actual goings-on were quite different. Norwest contracts with G.D. Van Wagenen Company, which is not a party here, to administer the collateral protection program by verifying whether borrowers have provided proof of insurance and sending notices to borrowers about Norwest's right to purchase insurance to protect its collateral. Van Wagenen is also a Voyager agent and is authorized to place insurance with Voyager when Norwest purchases it. An affiliate of Norwest, Norwest Insurance, Inc., which is also not a party to this suit, serves as the broker for the purchase of the insurance and receives commissions from Voyager on the premiums. Nevertheless, for purposes of this motion to dismiss, we must accept Roe's allegations as true.

-17-

Minnesota law does not provide a private cause of action for violations of these prohibitions. See Morris v. American Family Mut. Ins. Co., 386 N.W.2d 233, 238 (Minn. 1986). Instead, the Commissioner of Commerce is empowered to investigate violations, file charges, issue orders, and impose fines. See Minn. Stat. §§ 72A.201(1), 72A.21, 72A.08(3) (1996). In certain circumstances, the Commissioner may also obtain injunctive relief against an insurer. See Minn. Stat. § 72A.25(2)-(3) (1996).

RICO, by contrast, expressly grants treble damages, costs, and attorney fees to a victorious plaintiff. See 18 U.S.C. § 1964(c) (1994). Voyager argues that the application of RICO in this case would impair the operation of Minnesota's administrative remedial system by providing private plaintiffs with a remedy Minnesota does not provide and affording plaintiffs a recovery significantly greater than that which the state has authorized. In particular, Voyager suggests that the possibility of treble damages and attorney fees would eviscerate the administrative system by diverting any rational aggrieved policyholder from the Commissioner's office to federal court. Consequently, Voyager claims, an insurer that found itself the subject of an inquiry by the Commissioner would be unlikely to cooperate in the administrative process for fear of prejudicing its litigation position if a RICO suit should arise later.

The precise degree of impairment of a state statute that is required to trigger the operation of the McCarran-Ferguson Act is not settled. In its only opinion to address the question directly, the Supreme Court concluded that application of the federal securities laws to a merger of insurance companies would not impair the state's laws protecting policyholders. See SEC v. National Securities, Inc., 393 U.S. 453, 463 (1969). The Court noted that "Arizona has not commanded something which the Federal Government seeks to prohibit" but also recognized that the federal interest was directed toward protecting shareholders, while the state

statute was directed toward protecting policyholders.  See id.  The Court concluded, "[i]n these circumstances, we simply cannot see the conflict." Id.  In the case at bar, Minnesota has not commanded anything which RICO would prohibit; in other words, there is no direct conflict between federal and state law.  But, in contrast to National Securities, the federal and state statutes at issue here are directed toward the same end:  the protection of policyholders and prospective policyholders from fraudulent insurance practices.  The issue presented here, therefore, is whether a federal statute that is essentially parallel in substance to a state statute may impair the state statute because of a difference in the availability and the magnitude of the remedies they provide.

Several courts addressing this question have concluded that the McCarran-Ferguson Act is not implicated by federal law that is substantively parallel to state law.  See Villafane-Neriz v. FDIC, 75 F.3d 727, 736 (1st Cir. 1996) (Federal Deposit Insurance Act); Nationwide Mut. Ins. Co. v. Cisneros, 52 F.3d 1351, 1363 (6th Cir. 1995) (Fair Housing Act), cert. denied, 116 S. Ct. 973 (1996); Merchants Home Delivery Serv., Inc. v. Frank B. Hall & Co., 50 F.3d 1486, 1492 (9th Cir.) (RICO), cert. denied, 116 S. Ct. 418 (1995); NAACP v. American Family Mut. Ins. Co., 978 F.2d 287, 295-97 (7th Cir. 1992) (Fair Housing Act), cert. denied, 508 U.S. 907 (1993); Thacker v. New York Life Ins. Co., 796 F. Supp. 1338, 1342-43 (E.D. Cal. 1992) (RICO).  Other courts have disagreed, concluding that the intrusion of RICO's substantial damage provisions into a state's insurance regulatory program may so impair the state law as to bar application of RICO.  See Kenty, 92 F.3d at 392 (collateral protection insurance case; distinguishing Nationwide); Ambrose v. Blue Cross & Blue Shield, 891 F. Supp. 1153, 1165-68 (E.D. Va. 1995), aff'd, 95 F.3d 41 (4th Cir. 1996) (unpublished per curiam); Everson v. Blue Cross & Blue Shield, 898 F. Supp. 532, 544 (N.D. Ohio 1994); Wexco Inc. v. IMC, Inc., 820 F. Supp. 194, 203-04 (M.D. Pa. 1993); LeDuc v. Kentucky Cent. Life Ins. Co., 814 F. Supp. 820,

829 (N.D. Cal. 1992); <u>Senich v. Transamerica Premier Ins. Co.</u>, 766 F. Supp. 339, 341-42 (W.D. Pa. 1990) (collateral protection insurance case).

We find the latter line of cases more persuasive in the RICO context. As one court has noted, "the remedies available under RICO are among the most severe ever enacted in a federal civil statute." <u>Ambrose</u>, 891 F. Supp. at 1166. The state of Minnesota has determined that its insurance market can best be regulated by the Commissioner's pursuit of fines and injunctive relief. Congress has expressed its intention to leave the regulation of the business of insurance to the states unless a federal statute expressly addresses that subject or the application of a general federal statute would not invalidate, supersede, or impair a state statute. Were the question presented here, we might agree with the Sixth and Seventh Circuits that the federal civil rights statutes do not impair state insurance regulation. <u>Cf.</u> <u>Murff</u>, 97 F.3d at 292 (application of Age Discrimination in Employment Act to insolvent insurance company does not impair state insurance insolvency procedures).[11] But Voyager makes a compelling case that the extraordinary remedies of RICO would frustrate, and perhaps even supplant, Minnesota's carefully developed scheme of regulation. We do not read the term "impair" so narrowly as to permit the conclusion that the McCarran-Ferguson Act does not apply in the circumstances presented here. <u>See</u> Webster's Third New International Dictionary 1131 (1981) (defining "impair" as

---

Although <u>Murff</u> contains language suggesting that impairment will exist only in the case of a direct conflict between state and federal law, that language is certainly dictum in light of the Court's conclusion that application of the ADEA would have a de minimis effect, at most, on the insolvency proceedings. <u>See</u> <u>Murff</u>, 97 F.3d at 292 (citing Missouri statute giving policyholders priority over claims of employees). In addition, the ADEA, like the federal securities laws, is designed to protect parties other than policyholders. <u>Murff</u> therefore fits well within the framework of <u>National Securities</u>, <u>see</u> 393 U.S. at 463, and does not control here.

"diminish in quantity, value, excellence, or strength; do harm to").  The District Court correctly held that Roe's RICO allegations failed to state a claim.

## V.

The judgment of the District Court is affirmed.

HEANEY, Circuit Judge, concurring and dissenting.

I concur in Sections III and IV of the court's opinion.  I disagree, however, with the conclusions reached in Section II.  I believe the district court erred in granting summary judgment on the question of whether the payments that were made were premiums rather than interest payments.  I think this question can only be decided after an evidentiary hearing by the district court and that we should remand to the district court to hold such a hearing.  If the district court decides after an evidentiary hearing that the payments are interest payments in whole or in part, then it must determine whether the payments were usurious.  In reaching this decision, I believe it is clear that the rate of interest should be computed over the life of the loan rather than over the life of the agreement.

A true copy.

    Attest:

        CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.