# United States Court of Appeals
## For the Eighth Circuit

_____

No. 16-1561

_____

Dale R. Ludwick, on behalf of Herself and All Others Similarly Situated

*Plaintiff - Appellant*

v.

Harbinger Group, Inc.; Fidelity & Guaranty Insurance Company; Raven
Reinsurance Company; Front Street Re (Cayman), Ltd.

*Defendants - Appellees*

_____

Appeal from United States District Court
for the Western District of Missouri - Kansas City

_____

Submitted: November 16, 2016
Filed: April 13, 2017

_____

Before RILEY,[1] Chief Judge, WOLLMAN and KELLY, Circuit Judges.

_____

RILEY, Chief Judge.

---

[1]The Honorable William Jay Riley stepped down as Chief Judge of the United
States Court of Appeals for the Eighth Circuit at the close of business on March 10,
2017. He has been succeeded by the Honorable Lavenski R. Smith.

The question in this case is whether letting Dale Ludwick pursue her federal racketeering claims against an insurance company and its affiliates would impair state regulation of the insurance business in Iowa, Maryland, or Missouri. We agree with the district court[2] that it would, and the McCarran-Ferguson Act forbids that result. See 15 U.S.C. § 1012(b). We affirm the dismissal of Ludwick's claims.

## I.    BACKGROUND

The essence of Ludwick's case is that Fidelity & Guaranty Insurance Company (F&G)—directed by the hedge fund that owns it, Harbinger Group, Inc., and abetted by two related subsidiaries, Raven Reinsurance Company and Front Street Re (Cayman), Ltd.—misled her into paying too much for an F&G annuity. F&G did so, Ludwick says, by disseminating reports and marketing materials that did not properly reflect sham transactions F&G undertook to hide its true financial state. The details and ultimate propriety of those transactions are largely immaterial to our resolution of this appeal. As relevant, Ludwick's theory is that between 2011 and 2013, F&G took billions of dollars in liabilities off its books by transferring them to its affiliates Raven and Front Street, even though those companies did not have sufficient assets to cover them. At the same time, F&G marked up its valuation of the Raven stock it owned. And after quickly unwinding one of the transactions and taking some liabilities back from Raven, F&G arranged for an unaffiliated insurance company—apparently gratuitously—to assume those liabilities, plus others, while taking assets worth significantly less (and otherwise lacking the resources to cover them).

According to Ludwick, if F&G had properly accounted for these transactions under the principles promulgated by the National Association of Insurance Commissioners, as F&G claimed to do in its annual statements, F&G would have had

[2]The Honorable David Gregory Kays, Chief Judge, United States District Court for the Western District of Missouri.

to report its "surplus" was in fact negative—in other words, that its liabilities exceeded its assets.  Instead, F&G reported billion-dollar surpluses in each of 2011, 2012, and 2013.  Based, in part, on F&G's apparent financial good health, Ludwick bought an annuity in 2013.

Ludwick eventually became convinced F&G was not in as good shape as it seemed, and thus her annuity was not worth what she paid for it.  She sued under the Racketeer Influenced and Corrupt Organizations Act (RICO), see 18 U.S.C. § 1964(c), alleging F&G—under Harbinger's control and facilitated by the subsidiaries (collectively, F&G, from here on, except where context dictates otherwise)—committed numerous acts of mail and wire fraud in the course of a book-cooking scheme, most straightforwardly by distributing paper and electronic copies of its deceptive reports and marketing materials.[3]  See id. § 1962(c), (d) (imposing liability for conducting an enterprise's affairs through a pattern of racketeering activity and for conspiring to do so); see also id. § 1961(1) (defining racketeering activity).  The district court granted F&G's motion to dismiss for failure to state a claim on which relief can be granted, see Fed. R. Civ. P. 12(b)(6), relying on the McCarran-Ferguson Act and not reaching the merits of Ludwick's RICO claims. Ludwick appeals.  See 28 U.S.C. § 1291 (appellate jurisdiction).

## II.    DISCUSSION

The McCarran-Ferguson Act provides: "No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . unless such Act specifically relates to the business of insurance."  15 U.S.C. § 1012(b).  There is no suggestion RICO "specifically relates" to insurance, and no dispute Iowa, Maryland, and Missouri

---

[3]Ludwick filed her case as a class action, seeking to represent everyone who has bought annuities from F&G since Harbinger acquired the company in April 2011. The district court dismissed the suit before ruling on class certification, and class issues are not relevant to this appeal.

(respectively, where F&G is based now, where it was based until 2013,[4] and where Ludwick lives) regulate the insurance business. Nor would imposing RICO liability for F&G's alleged misconduct "invalidate" or "supersede" Iowa, Maryland, or Missouri law. See Humana Inc. v. Forsyth, 525 U.S. 299, 307 (1999) (giving the terms their ordinary meanings). The only question is whether Ludwick's RICO charges would "impair" state insurance regulation.

This question, like the sufficiency of Ludwick's allegations more generally, is a legal issue we review de novo. See, e.g., Saunders v. Farmers Ins. Exch., 537 F.3d 961, 963 (8th Cir. 2008). The Supreme Court articulated the governing standard in Humana Inc. v. Forsyth: "When federal law does not directly conflict with state regulation, and when application of the federal law would not frustrate any declared state policy or interfere with a State's administrative regime, the McCarran-Ferguson Act does not preclude its application." Humana, 525 U.S. at 310.

Ludwick insists her suit threatens no conflict, frustration, or interference because it is just about F&G's bookkeeping, not the underlying propriety of the transactions or state regulators' approval of them. The distinction cannot bear the weight of Ludwick's argument. "In applying Humana's fact-intensive interpretation of the word 'impair,' our focus must be on the precise federal claims asserted," because "a statute might 'impair' state insurance laws when applied in some ways, but not in others." Saunders, 537 F.3d at 967. The precise claims asserted in this case arise out of F&G, in Ludwick's words, "misrepresent[ing] the true financial condition of [the company] in its public reports and marketing materials, artificially

_____

[4]Ludwick makes little mention of Maryland law in her briefs, explaining she "does not contend" it applies. We see no reason why that should matter. Maryland had primary regulatory authority over F&G for most of the time covered by Ludwick's complaint, and the existence of a third state whose regulation of the insurance business might be affected by federal litigation is a potential flaw in Ludwick's case, not a supplemental theory she can choose to forgo or ignore.

inflating its purported assets and surplus." Ruling on those claims would necessarily involve deciding whether the supposed sham transactions left F&G in the healthy financial position it reported, or whether Ludwick is correct that a proper accounting would have shown liabilities substantially exceeding F&G's assets (as Ludwick says, "a *negative statutory surplus*").

Questions about insurance companies' solvency are, no surprise, squarely within the regulatory oversight by state insurance departments. In Maryland (as elsewhere) deals like those underlying Ludwick's case—namely, reinsurance transactions with affiliates—must be submitted to the insurance commissioner for review before they can be consummated. See Md. Code Ann., Ins. § 7-703(a)(1), (c), (d)(4); see also Iowa Code § 521A.5(1)(c)(1). See generally Saunders, 537 F.3d at 965 ("Like most States, Missouri thoroughly regulates the business of insurance."). And the commissioner is directed to consider both whether the transaction "potentially adversely affects the interests of policyholders" and whether "after the transaction, . . . the insurer has assets and surplus as regards policyholders that: (i) bear a reasonable relation to the insurer's outstanding liabilities; and (ii) are adequate to meet the insurer's financial needs." Md. Code Ann., Ins. §§ 7-702(3), -703(e); see also Iowa Code § 521A.5(1)(a)(6), (f). For all practical purposes, that is the same inquiry Ludwick's claims seek. A federal court could not rule in Ludwick's favor without holding, more or less explicitly, that state insurance regulators were wrong to let the transactions proceed, because the negative surplus Ludwick alleges would be patently unreasonable and inadequate. Cf. Saunders, 537 F.3d at 968 ("'[A] more complete overlap with the state [agency's] . . . decisions is impossible to conceive.'" (second alteration in original) (quoting Dehoyos v. Allstate Corp., 345 F.3d 290, 302 (5th Cir. 2003) (Jones, J., concurring in part and dissenting in part))); Doe v. Mut. of Omaha Ins. Co., 179 F.3d 557, 564 (7th Cir. 1999) ("Even if the formal criteria are the same under federal and state law, displacing their administration into federal court—requiring a *federal* court to decide whether an insurance policy is consistent with *state* law—obviously would interfere with the

administration of the state law.  The states are not indifferent to who enforces their laws.”).

This conclusion holds even though Ludwick sometimes describes the relevant misconduct as not the accounting itself, let alone the underlying transactions, but F&G's representation that it arrived at the numbers in its reports without departing from the standard accounting principles it purported to follow.  To start, we agree with F&G that this theory is a “Post-Hoc Reformulation” of Ludwick's claims.  Yes, Ludwick's case has always been about F&G “fraudulently dup[ing]” her into buying the annuity, but until now her story was that she was duped by lies about the company's financial strength, not lies about its accounting practices.  The new theory does not solve the problem.  To decide whether F&G's reported financials reflected a significant departure from the accounting principles it claimed to have followed, a federal court would need to ask what the result of the transactions should have been under those principles.  That would drag the court right back into second-guessing state regulators' oversight of F&G's solvency and stability.

Ludwick also warns against “resurrect[ing] field-preemption arguments that the Supreme Court expressly rejected in Humana.”  See Humana, 525 U.S. at 308 (“We reject any suggestion that Congress intended to cede the field of insurance regulation to the States.”).  Her concerns are unfounded.  The reason Ludwick cannot pursue her RICO claims is not the mere fact that they relate to the insurance business in the abstract, as it would be under a field-preemption analysis, but that, as a practical matter, a federal court ruling on the specific things Ludwick alleges against this particular insurance company would mean asking the same questions as state insurance regulators ask and effectively double-checking their work.  In other words, such review is just the sort of case-specific intrusion and interference we have held the McCarran-Ferguson Act forbids.  See Saunders, 537 F.3d at 967-68.

-6-

The Supreme Court's decision in SEC v. National Securities, Inc., 393 U.S. 453 (1969), does not help Ludwick either, despite some superficial similarities to this case. In National Securities, the Court held the Securities and Exchange Commission (SEC) could unwind an insurance-company merger based on allegations that the letters soliciting approval from the target company's shareholders failed to disclose that they would be paying for the takeover of their own company (among other misrepresentations), even though state regulators had already signed off on the deal. Id. at 455, 462-63. Ludwick latches onto the Court's explanation that "[t]he gravamen of the [SEC's] complaint was the misrepresentation, not the merger," id. at 462, which she takes to mean she is safe from the McCarran-Ferguson Act as long as the federal and state inquiries are technically about different things. The Court did not limit itself to such formalities however—key to its conclusion was that the SEC's arguments for undoing the merger (in short, that it was accomplished by deceiving shareholders) really were entirely separate from the state regulators' review and approval, which centered on the effect of the combination on policyholders. See id. at 463 ("Different questions would, of course, arise if the Federal Government were attempting to regulate in the sphere reserved primarily to the States by the McCarran-Ferguson Act."). In Ludwick's case, by contrast, the federal claims and the state determinations boil down to the same issue, namely, how the alleged sham transactions, properly accounted for, affected F&G's balance sheet. Cf. Doe v. Norwest Bank Minn., N.A., 107 F.3d 1297, 1307-08 (8th Cir. 1997) (concluding state insurance regulation would be impaired by RICO claims against an insurer where, "in contrast to National Securities, the federal and state statutes at issue . . . are directed toward the same end").

Ludwick's final attempt to save at least a subset of her claims is also meritless. Her argument is that because only F&G itself is actually subject to state insurance laws, "surely [the McCarran-Ferguson Act] does not preclude the assertion of a federal RICO claim" as to the other defendants. But the Act is concerned with the practical effect of federal law on state insurance regulation, see 15 U.S.C. § 1012(b);

Saunders, 537 F.3d at 967, regardless of whom it targets as a technical legal matter. Litigating claims premised on F&G's conduct and financial condition against Harbinger, Raven, and Front Street would be no less disruptive of state insurance regulation than if F&G were a party as well.

Though we agree with the district court's disposition of the case, we do not adopt the reasoning the district court thought controlling—that "the lack of a private right of action under the states' insurance codes is dispositive" and "the availability of common law remedies [could] not save [Ludwick's] RICO claim from reverse preemption." According to F&G, the district court's rule "makes sense because the lack of a private right of action reflects a state determination that ancillary actions will impair the functioning of the regulatory framework." But why assume, as that explanation implicitly does, that an ancillary common-law action would be any less disruptive? To the contrary, if it were clearly established that a state let aggrieved parties bring common-law claims against insurance companies in a given situation, we would seem to be justified in drawing much the same inference as if the cause of action were written into the insurance code, namely that the state had not found its regulatory efforts frustrated by the availability of private litigation. See Humana, 525 U.S. at 312 (citing the availability of analogues under "other state laws, statutory *or decisional*," as tending to show that allowing RICO claims would not impair Nevada's regulation of the insurance business (emphasis added)); Saunders, 537 F.3d at 968 (reaching the opposite conclusion because, among other reasons, "neither the Missouri insurance laws *nor Missouri common law* provide a private right of action for [the alleged misconduct]" (emphasis added)); LaBarre v. Credit Acceptance Corp., 175 F.3d 640, 643 (8th Cir. 1999) ("Minnesota law permits only administrative recourse for violations of [the relevant provision] and, unlike RICO, does not provide a private cause of action.").[5]

---

[5]The district court read our ruling against the plaintiff in LaBarre differently, reasoning that because (in the district court's view) Minnesota law did in fact allow

-8-

Such an inference is not warranted in this case, because Ludwick has failed to establish that the specific sort of misconduct she alleges—an insurer lying about its financial condition and accounting—would be actionable under the common law of each implicated jurisdiction. With respect to Maryland and Missouri, all Ludwick even purports to show is that each state "recognizes a common-law claim for fraudulent inducement" against insurance companies. Yet the fact that the state might allow some claims within such a broad category sheds little light on the disruptive effects of Ludwick's particular theory of liability. Cf. Saunders, 537 F.3d at 967 (calling for a "fact-intensive" and context-specific analysis).

Two last points. First, because we conclude Ludwick's federal claims are barred by the McCarran-Ferguson Act, we do not reach F&G's alternative arguments that Ludwick lacked standing to sue under RICO and failed plausibly to allege a scheme or intent to defraud. We do take issue with F&G's contention that Ludwick's allegations are implausible—indeed, "preposterous" and "outlandish"—and we should affirm their dismissal not because of any legal infirmity, but because it is hard to believe someone like Ludwick could have uncovered a fraud that eluded "multiple insurance regulators, a major auditing firm, industry ratings agencies, and the market."[6] It should (but apparently does not) go without saying that speculation

some common-law claims for fraud and breach of contract against insurance companies, the existence of such causes of action must be irrelevant, otherwise it would have factored into our analysis. But LaBarre made no mention of the common law and, by all indications, rested on an understanding that "Minnesota law permit[ted] *only* administrative recourse." LaBarre, 175 F.3d at 643 (emphasis added). Regardless of whether that remains an accurate description of Minnesota law, nothing in LaBarre suggests we meant to address a situation where a plaintiff specifically could not sue under the insurance code, but could under some other part of state law. See also Norwest Bank Minn., 107 F.3d at 1306 ("Minnesota law does not provide a private cause of action for violations of these prohibitions.").

[6]"Far more plausible," F&G assures us, "is that [Ludwick] does not fully understand these transactions, or simply holds a view of affiliate reinsurance

about the likelihood a particular plaintiff would be the one to catch the misconduct she alleges is no reason to throw out her complaint, all the more so when the speculation is based on thinly veiled assumptions about the party's relative status and sophistication. Cf. Ashcroft v. Iqbal, 556 U.S. 662, 681 (2009) ("To be clear, we do not reject these bald assertions on the ground that they are unrealistic or nonsensical. We do not so characterize them . . . . It is the conclusory nature of [the plaintiff's] allegations, rather than their extravagantly fanciful nature, that disentitles them to the presumption of truth."); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556 (2007) ("[O]f course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable."). We therefore emphasize that Ludwick's loss in this case reflects Congress's deference to the states as the traditional regulators of insurance business, see 15 U.S.C. § 1012, not a ruling on the truth of Ludwick's claims or a validation of the financial machinations underlying them.

Second, at oral argument Ludwick asked to be given a chance to cure the defects in her complaint if we affirmed the dismissal of her claims, acknowledging she had not sought to do so in the district court. The time for amending the complaint, either as of right or with the court's leave, see Fed. R. Civ. P. 15(a)(1), (2), has passed—there is a final judgment, now affirmed on appeal, dismissing the case. Cf. Geier v. Mo. Ethics Comm'n, 715 F.3d 674, 677 (8th Cir. 2013).

## III.  CONCLUSION

Litigating Ludwick's RICO claims would interfere with state regulation of the insurance business, and the claims are barred by the McCarran-Ferguson Act. The district court was right to dismiss. We affirm.

_____

---

transactions that is not shared by the relevant state regulators."